[No. 48133–4. En Banc. February 17, 1983.]

CHICAGO BRIDGE & IRON COMPANY, *Appellant,* v.
THE DEPARTMENT OF REVENUE, *Respondent.*

*Francis A. LeSourd, Rodney J. Waldbaum, Daniel D. Woo,* and *LeSourd, Patten, Fleming, Hartung & Emory,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Andrew C. Harvard, Assistant,* for respondent.

BRACHTENBACH, J.—Appellant Chicago Bridge & Iron Company (CBI) seeks a refund of a portion of business and occupation (B & O) taxes paid on the gross receipts of sales of goods designed, manufactured, and installed for customers in Washington, but contracted for outside the state. CBI contends the tax is unconstitutional as a violation of due process (U.S. Const. amend. 14, § 1 and Const. art. 1, § 3) and the commerce clause (U.S. Const. art. 1, § 8, cl. 3). The trial court found the tax constitutional and denied CBI's refund request. We accepted direct review and affirm.

CBI is an Illinois corporation licensed to do business as a foreign corporation in Washington. The corporation designs, engineers, manufactures and installs large, welded steel–plate structures, such as storage tanks, silos, nuclear containment vessels, and hydroelectric generator components.

At issue here are 16 of a total of 149 contracts for CBI products, designed, manufactured, and installed for Washington customers during the audit period of 1967–75. For all 149 contracts the products were manufactured outside

the state of Washington, but they were designed for use by a Washington customer and were delivered and permanently installed in this state. CBI voluntarily paid taxes on 133 contracts not at issue in this action.

The principal distinction between the 16 contracts included in this action and the other 133 contracts is that neither the negotiation for, nor the formalization of, the contracts in this action took place within the state of Washington or involved CBI's Seattle sales office. Because the negotiation and formalization of these contracts occurred out of state, CBI argues there was no "sales" activity within the state, and therefore a B & O tax measured by the gross proceeds of sales is improper.

For 13 of the 16 contested contracts, CBI installed or assembled its product in Washington and does not contest the assessment of B & O taxes on the portion of their revenue attributed to these in–state activities.[1] It does contest, however, the B & O tax assessed on the total revenue from the sales.

For three of the contracts, CBI bifurcated its contract to design, manufacture and deliver the product from the contract to assemble and install the product. At the request of the purchaser, CBI entered into six separate written contracts concerning three products: three with Kamyr, Inc., for the design and fabrication of the product, and three with Kamyr, Inc.'s sister corporation, Kamyr Installations, Inc., for installation of the three products at Everett, Washington. As with all other contracts, a lump–sum contract price represented the total of CBI's involvement, from design through installation, for these three products. Concerning the three contracts for design and fabrication, CBI maintains Washington has no jurisdiction to impose its B & O tax. CBI does not contest the imposition of the Washington B & O tax upon the three corresponding installation contracts and those contracts are not included in this

---

[1]CBI estimates its installment activities constitute 30 to 40 percent of the total contract price.

action. The three Kamyr contracts will be given special attention in the analysis below.

First, however, some explanation of CBI's business operations may prove helpful. CBI generally performs all aspects of design, manufacture, delivery and installation of its product and customers negotiate a single, lump–sum price for a finished, installed product. CBI's engineering, manufacturing, and installation operations are functionally integrated and coordinated from the first proposal to a customer through each phase of the design, manufacturing and installation process. This integration is accomplished through frequent communications among the divisions and departments of the company. Although CBI's products may be similar in function and appearance, each is custom made to the specifications of the customer. Each product here was designed and manufactured for permanent installation and use in Washington.

CBI maintains a sales office in Seattle, which is responsible for customers whose purchasing offices are located in Alaska, Washington, Oregon, Idaho and Montana. The Seattle sales office was not directly involved in the procurement of these 16 contracts, because the principal offices of the corporate purchasers were not in its district. Nonetheless, the Seattle office was informed, as a matter of courtesy and pursuant to CBI's general practices, of contracts which involved work within its territory. This information was usually received through informational copies of the contract or correspondence.

CBI has permanent employees, project managers, who supervise and coordinate the installation and cost controls associated with the contracts. These individuals generally perform a site survey at the installation site in Washington when the contract is first obtained, and visit the site during the installation process.

Installation requires extensive site preparation and on–site assembly of parts. Permanent CBI foremen supervise the installation process. The persons who do the actual moving of equipment and materials and the welding neces-

sary to the installation of the products are hired by CBI from local Washington union hiring halls. Other permanent CBI employees visit the Washington installation sites to ensure customer specifications and CBI standards are being achieved.

The total number of CBI employees in Washington during the audit period ranged from 11 to 309.

Beginning in 1969 and throughout the audit period, CBI also maintained a warehouse in Tacoma, Washington, for the central storage and maintenance of equipment used in the installation of its products. The warehouse had a maximum staff of four persons.

I

An analysis of this case necessarily begins with the challenged tax statute. RCW 82.04.220 imposes a business and occupation tax for "the act or privilege of engaging in business activities." For wholesale and retail sales, the tax is measured by the application of rates against the gross proceeds of sales. RCW 82.04.220. During the audit period, the amount of the tax was computed as the gross proceeds of sales of the business multiplied by the rate of forty–four one–hundredths of 1 percent. RCW 82.04.250; RCW 82.04.270(1). "'Gross proceeds of sales' means the value proceeding or accruing from the sale of tangible personal property and/or for services rendered," without any deduction for costs of material or labor or any other expenses. RCW 82.04.070.

The statute also provides for the deduction from the measure of tax amounts which the State is prohibited from taxing under the state or federal constitution. RCW 82.04-.430(6) (subsequently recodified as RCW 82.04.4286). Thus, if this tax were in violation of the due process or commerce clauses, it would also be in violation of RCW 82.04.430(6).

II

Turning first to the due process issue, we note that due process and commerce clause challenges, while theoretically different, are closely related. *National Bellas Hess, Inc. v.*

*Department of Rev.,* 386 U.S. 753, 18 L. Ed. 2d 505, 87 S. Ct. 1389 (1967). Therefore, much of our analysis here will be equally applicable to the commerce clause discussion and vice versa.

■■ Due process focuses on whether a state is taxing beyond its jurisdictional reach. *National Bellas Hess,* at 756. The test applied to state taxation of interstate business under the due process clause is two pronged: (1) There must be a "minimal connection" or "nexus" between the interstate taxing activities and the taxing state; and (2) the income attributed to the state for tax purposes must be rationally related to "'values connected with the taxing State.'" *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 273, 57 L. Ed. 2d 197, 98 S. Ct. 2340 (1978); *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 436–37, 63 L. Ed. 2d 510, 100 S. Ct. 1223 (1980); *Exxon Corp. v. Department of Rev.,* 447 U.S. 207, 219–20, 65 L. Ed. 2d 66, 100 S. Ct. 2109 (1980). Nexus is established if the corporation "avails itself of the 'substantial privilege of carrying on business' within the State". *Mobil,* at 437, quoting *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 444–45, 85 L. Ed. 267, 61 S. Ct. 246, 130 A.L.R. 1229 (1940).

CBI has isolated the 16 contracts in this action because the Seattle sales office was not involved in the contract procurement activities. Yet, United States Supreme Court cases reveal that the presence and participation of a sales office in state is not decisive in determining the existence of nexus.

In *Standard Pressed Steel Co. v. Department of Rev.,* 419 U.S. 560, 42 L. Ed. 2d 719, 95 S. Ct. 706 (1975) the absence of a sales office in state did not insulate an out–of–state manufacturer from paying Washington's business and occupation tax on items sold to a Washington customer. Nexus was established through the presence of an engineer in Washington who, while not involved in the sales, routinely consulted with the customer regarding its needs for the manufactured product.

In *General Motors Corp. v. Washington,* 377 U.S. 436, 12

L. Ed. 2d 430, 84 S. Ct. 1564 (1964), the out–of–state manufacturer employed in–state, district managers who supervised the independent dealers and in–state service representatives who assisted in any trouble experienced. In addition, some out–of–state personnel performed activities in state and General Motors maintained a parts warehouse in Seattle. The Court concluded that such a maze of local connections prohibited the corporation from claiming tax immunity as an interstate business. Nexus is established if in–state services are substantial "with relation to the establishment and maintenance of sales, upon which the tax was measured." *General Motors,* at 447.

It is only when activities in the state are in no way connected with the business taxed that nexus has been found to be absent. This was the case in *Norton Co. v. Department of Rev.,* 340 U.S. 534, 95 L. Ed. 517, 71 S. Ct. 377 (1951). No nexus was found in *Norton* for orders sent directly to an out–of–state manufacturer, filled there, and shipped directly to the customer, even though there was a sales office in the taxing state. This conclusion was premised on the absence of any connection between the local office and the interstate sales.

The instant case is similar to *Standard Pressed Steel* and *General Motors.* CBI employs a number of individuals in Washington who supervise the site preparation and installation of its products, and who are available if problems arise. It also maintains a warehouse of equipment for installation and maintenance of its products. Such activities demonstrate that CBI has availed itself of the substantial privilege of doing business in Washington. *See Mobil Oil Corp. v. Commissioner of Taxes, supra.* Also shown is the substantial relationship between CBI's in–state services and the establishment and maintenance of sales upon which the tax was measured. *See General Motors Corp. v. Washington, supra.* Unlike *Norton* where the customer had no contact with in–state, corporate personnel, CBI employs supervisors in Washington who have direct contact with the customer. There is also a close connection between the

product itself and the state, as the structures are custom designed for use by Washington customers and are permanently installed here. Thus, nexus is firmly established.

While CBI does not strongly contest nexus as to 13 of the 16 contracts, it does assert that no nexus was established as to the Kamyr contracts. As stated above, these 6 contracts bifurcated the design and manufacturing of three products from their installation. Hence, CBI argues that the 3 contracts covering only the design and manufacturing phase have no nexus with Washington. We disagree.

These contracts have sufficient "minimal connections" with Washington for a number of reasons. First, the products were custom made for a customer in Washington, and with the knowledge they were to be permanently installed in this state. This is substantially more than mere knowledge that a fungible product in the stream of commerce is destined for use in the taxing state. See *American Oil Co. v. Neill*, 380 U.S. 451, 14 L. Ed. 2d 1, 85 S. Ct. 1130 (1965).

Second, once a corporation enters a state to do local business and has submitted itself to the taxing power of the state, it is the corporation's burden to exempt itself from the local tax by showing no in–state activities were associated with the interstate business. *Norton*, at 537; *American Oil Co. v. Neill, supra.* To meet this burden, a corporation must show that its in–state services were not decisive in establishing and holding the market. *General Motors*, at 448; *Norton*, at 538. This CBI has failed to do. In our opinion, it defies common sense to say the presence of a local office, full–time supervisors, and a warehouse containing installation and maintenance equipment did not play a role in CBI's successful attainment of these contracts. The value of the goodwill imparted by local personnel and the value of their presence should problems arise cannot be underestimated in the context of contracts for permanent structures worth thousands of dollars.

Furthermore, CBI's isolation, for taxing purposes, of its contracts for design and manufacturing from those for installation appears an exaltation of form over substance.

*See Time Oil Co. v. State,* 79 Wn.2d 143, 483 P.2d 628 (1971). On several occasions the United States Supreme Court has recognized that a company's internal accounting techniques are not binding on a state for tax purposes. *See, e.g., Exxon Corp. v. Department of Rev., supra.* As was stated in *Mobil Oil Corp. v. Commissioner of Taxes, supra* at 438:

> [S]eparate accounting, while it purports to isolate portions of income received in various States, may fail to account for contributions to income resulting from functional integration, centralization of management, and economies of scale.

These Kamyr contracts were entered into with sister corporations, and the bifurcation was done at the request of the purchaser. Moreover, a single, lump–sum price was negotiated for the entire project, as with all other CBI contracts. Thus, from CBI's standpoint, and from the standpoint of CBI's taxation obligation, the contracts are indistinguishable from all the others. In short, no less than with the other contracts, CBI's presence in the state was undoubtedly a factor in the procurement of all six contracts for the three Kamyr projects. Therefore, nexus existed for each of the three Kamyr *projects* and the taxing authority properly treated the lump–sum proceeds as subject to the B & O tax.

■■ Under the second prong of the due process test, a tax must be rationally related to "'values connected with the taxing State.'" *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 273, 57 L. Ed. 2d 197, 98 S. Ct. 2340 (1978). This requirement is met if the state's taxing formula is not inherently arbitrary and does not tax a proportion of the taxpayer's income "'out of all appropriate proportion to the business transacted . . . in that State". *Exxon Corp. v. Department of Rev., supra* at 227; *Moorman,* at 273–74. Arithmetical perfection is not required. *Moorman,* at 286 (Powell, J., dissenting).

Washington's B & O tax on interstate businesses has previously been held valid under this due process test. *See*

*General Motors Corp. v. Washington, supra.* The formula is neither arbitrary nor all out of proportion to the business activities within the state, for it is collected only upon the gross proceeds of sales "in this state". WAC 458-20-193B. No such tax is assessed against interstate sales to other states. Hence the tax is inherently proportioned to in-state activities.

CBI argues rigorously that it is immune from the B & O tax because the contract "procurement" activities occurred outside Washington, thus leading to the conclusion that no "sales" activities occurred in state. RCW 82.04.250. Such an argument ignores the practicalities of modern business practice. As many corporations engage in business and maintain branch offices in numerous foreign jurisdictions, it is not surprising that contracts are negotiated and signed at locations other than the jurisdiction for which the product is intended. *See Fibreboard Paper Prods. Corp. v. State,* 66 Wn.2d 87, 401 P.2d 623 (1965). Corporate convenience, however, is not controlling in the context of the incidence of a tax. Were it otherwise, substantial taxes could be avoided simply by consummating all contracts outside the borders of the taxing state.

That the B & O tax formula results in taxation of some income which did not have its source within the taxing state does not render it "out of all proportion" under a due process analysis. *Moorman Mfg. Co. v. Bair,* at 272. In *Moorman,* the United States Supreme Court upheld as constitutional a tax formula that occasionally over-reflected or under-reflected income attributable to the taxing state. Despite this "imprecision," the Court "refused to impose strict constitutional restraints on a State's selection of a particular formula." *Moorman,* at 273; *see also Underwood Typewriter Co. v. Chamberlain,* 254 U.S. 113, 65 L. Ed. 165, 41 S. Ct. 45 (1920); *Bass, Ratcliff & Gretton, Ltd. v. State Tax Comm'n,* 266 U.S. 271, 69 L. Ed. 282, 45 S. Ct. 82 (1924); *Ford Motor Co. v. Beauchamp,* 308 U.S. 331, 84 L. Ed. 304, 60 S. Ct. 273 (1939).

In short, states have broad latitude under the due pro-

cess clause to tax as a means of distributing the burden of the cost of government, not simply as an assessment of benefits received by foreign corporations. *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 69 L. Ed. 2d 884, 101 S. Ct. 2946 (1981). Washington's B & O tax is sufficiently tied to the privilege of doing business within the state to meet the due process requirements.

■ In individual cases, the United States Supreme Court has found a tax formula, while valid on its face, may violate the due process clause when applied to a particular taxpayer. *See Hans Rees' Sons, Inc. v. North Carolina ex rel. Maxwell,* 283 U.S. 123, 75 L. Ed. 879, 51 S. Ct. 385 (1931); *Norfolk & W. Ry. v. Missouri State Tax Comm'n,* 390 U.S. 317, 19 L. Ed. 2d 1201, 88 S. Ct. 995 (1968). In each of these cases, however, it has been the taxpayer's burden to prove by "clear and cogent evidence" that the tax was "out of all appropriate proportion to the business transacted" within the state, *Hans Rees',* at 135, or had "led to a grossly distorted result," *Norfolk,* at 326. CBI has not met this burden. As stated above, we find CBI's presence and activities in the state, the fact that the sales involved products designed for and permanently installed in Washington, and the fact that Washington's tax reaches only sales made to customers in this state, combine to rebut any allegations that the tax is "all out of proportion" to the in–state business. Thus, we conclude CBI's due process challenge must fail.

### III

Next, we address CBI's challenge under the commerce clause. U.S. Const. art. 1, § 8, cl. 3. Theoretically, a commerce clause challenge is a claim that a tax as applied impedes commerce by giving a state more than its fair share of a generally applicable tax. *National Bellas Hess, Inc. v. Department of Rev.,* 386 U.S. 753, 18 L. Ed. 2d 505, 87 S. Ct. 1389 (1967). It has long been recognized, however, that "'[i]t was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their

just share of state tax burden even though it increases the cost of doing the business.'" *General Motors Corp. v. Washington,* 377 U.S. 436, 439, 12 L. Ed. 2d 430, 84 S. Ct. 1564 (1964), quoting *Western Live Stock v. Bureau of Rev.,* 303 U.S. 250, 254, 82 L. Ed. 823, 58 S. Ct. 546, 115 A.L.R. 944 (1938). "[I]nterstate business must pay its way". *Postal Telegraph–Cable Co. v. Richmond,* 249 U.S. 252, 259, 63 L. Ed. 590, 39 S. Ct. 265 (1919).

██ The four commerce clause requirements for a state tax on interstate commerce are set forth in the seminal case of *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 278–82, 51 L. Ed. 2d 326, 97 S. Ct. 1076 (1977): (1) There must be a sufficient connection or nexus between the interstate activities and the taxing state; (2) the tax must be fairly apportioned; (3) the tax must not discriminate against interstate commerce; and (4) the tax must be fairly related to the services provided by the state.

The first, nexus, requirement was established in the due process discussion, *supra.* The analysis is equally applicable in the context of the commerce clause, and needs no further elaboration.

The second, apportionment, requirement is the true focus of CBI's challenge. CBI argues that a B & O tax measured against 100 percent of the gross proceeds of sales is not a fair apportionment; in fact, CBI asserts that it is not apportioned at all. This argument, however, appears to misunderstand both the nature of Washington's tax and the holdings of recent United States Supreme Court cases.

██ An examination of United States Supreme Court cases which have previously upheld Washington's B & O tax against a commerce clause challenge is useful to understand the apportionment requirement. In *General Motors Corp. v. Washington, supra,* appellants unsuccessfully challenged the B & O wholesale tax imposed on its products manufactured out of state. The Court stated:

the validity of the tax rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special

relation. . . . [T]he question is whether the State has exerted its [taxation] power in proper proportion to appellant's activities within the State *and* to appellant's consequent enjoyment of the opportunities and protections which the State has afforded.

(Italics ours.) *General Motors,* at 440–41. Thus, a corporation's "activities" within a state are not necessarily limited to acts done while physically within its boundaries if the activities have the consequence of affording the actor opportunities and protections of the state. In addition, *General Motors* emphasized that once a corporation has entered a state and engaged in activities therein, it has the burden of showing that the transactions for which it claims tax immunity are "'dissociated from the local business". *General Motors,* at 441, quoting *Norton Co. v. Department of Rev.,* 340 U.S. 534, 537, 95 L. Ed. 517, 71 S. Ct. 377 (1951).

Washington's B & O tax was again challenged in *Standard Pressed Steel Co. v. Department of Rev.,* 419 U.S. 560, 42 L. Ed. 2d 719, 95 S. Ct. 706 (1975). *Standard Pressed Steel* involved an out–of–state corporation that manufactured products sold to the Boeing Company in Seattle, Washington. The corporation's only presence in the state was an engineer who consulted with Boeing regarding its needs for the product and followed up on any difficulties after delivery. The engineer was not, however, involved in the actual sales and he had no office other than his home. Nonetheless, the Court held that these activities were "substantial 'with relation to the establishment and maintenance of sales, upon which the tax was measured". *Standard Pressed Steel,* at 563, quoting *General Motors,* at 447. The Court noted that the activities of the in–state employee were necessary in obtaining and retaining goodwill and rapport with Boeing, in addition to his more tangible functions. Furthermore, because the B & O tax was upon gross receipts from sales made to a local consumer, and not upon the entire volume of the interstate commerce in which the corporation participated, the Court concluded

the tax was "'apportioned exactly to the activities taxed,' all of which are intrastate." *Standard Pressed Steel,* at 564, quoting *Gwin, White & Prince, Inc. v. Henneford,* 305 U.S. 434, 440, 83 L. Ed. 272, 59 S. Ct. 325 (1939).

The most recent United States Supreme Court case addressing Washington's B & O tax is *Department of Rev. v. Association of Wash. Stevedoring Cos.,* 435 U.S. 734, 55 L. Ed. 2d 682, 98 S. Ct. 1388 (1978). In that case, the 4–part test articulated in *Complete Auto Transit, Inc. v. Brady, supra,* was applied for the first time to Washington's tax. The Court concluded that the B & O tax on in–state stevedoring activities was constitutional. Equally important to the present action, the Court emphasized that "a State has a significant interest in exacting from interstate commerce its fair share of the cost of state government." *Stevedoring,* at 748.

These cases compel the conclusion that the B & O tax as applied to CBI is justly apportioned to meet a commerce clause challenge. In designing and manufacturing products destined for permanent installation in Washington, CBI enjoyed the sales opportunities offered by Washington's economy and the general protections afforded to interstate businesses with local incidents. Hence, a special relation exists. *See General Motors Corp. v. Washington, supra.*

In addition, as CBI has established a local office here, it must sustain the burden of dissociating its transactions for which it claims tax immunity. *General Motors Corp. v. Washington, supra.* This burden has not been met. CBI's local involvement in site preparation and overall supervision of the contracts contradicts any disassociation argument. Moreover, although the Seattle sales office was not involved in the contract procurement, it was involved in the passive sense of being present, aware of the transaction, and available to assist if necessary. Local CBI personnel were also available to resolve any difficulties with the product and maintain the goodwill of the customer. We find that these activities had a substantial relation to the establishment and maintenance of the sales upon which the

tax was measured. *See Standard Pressed Steel Co. v. Department of Rev., supra.* Finally, the tax was assessed only upon the gross receipts of sales made to Washington customers and not on the entire volume of CBI's interstate commerce. *See Standard Pressed Steel Co. v. Department of Rev., supra.* For all these reasons, we find it was fairly apportioned to the activities taxed.

CBI suggests the continued validity of *General Motors, Standard Pressed Steel, Complete Auto Transit,* and *Stevedoring* has been brought into question by the recent cases of *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 63 L. Ed. 2d 510, 100 S. Ct. 1223 (1980) and *Exxon Corp. v. Department of Rev.,* 447 U.S. 207, 65 L. Ed. 2d 66, 100 S. Ct. 2109 (1980) which, CBI argues, mandate a different apportionment formula. We find, however, that *Mobil* and *Exxon* do not undercut prior case law, are distinguishable on their facts, and are consistent with the conclusions reached herein.

In analyzing *Mobil* and *Exxon* it is imperative to remember those cases address a taxing formula distinctly different from Washington's B & O tax. Unlike Washington's tax that attaches only to sales in Washington, the state tax formulas analyzed in *Mobil* and *Exxon* used as their tax base *all net income* of the corporation, regardless of where it was earned. These formulas are necessarily different from a gross proceeds tax which uses as its base only that portion of the business' income that is derived from sales to customers in that state.

*Mobil* and *Exxon* established the rule that a state may include income from foreign income sources in its net income base, if the taxing formula is apportioned to reflect a "rough approximation" of the corporate income "'reasonably related to the activities conducted within the taxing State.'" *Exxon,* at 223; *Mobil Oil Corp. v. Commissioner of Taxes, supra.* The holdings in *Mobil* and *Exxon* prevent a business from using geographically discrete accounting methods to immunize portions of its operations from a net income tax base. Thus, these cases reject geographical

accounting as a means of segregating the value of out–of–state operations from the measure of a net income tax. An appropriate analogy here is the rejection of CBI's attempt to geographically segregate the value of its out–of–state operations from the measure of Washington's B & O tax. Hence, contrary to CBI's assertion, these cases do not support its position.

To summarize the apportionment discussion, we view Washington's B & O tax on gross proceeds of sales as inherently apportioned because it taxes only sales in Washington, not the total volume of sales made by an interstate business. Although the formula may result in taxation of some income not generated within the state, an exact apportionment formula is not constitutionally required. *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 57 L. Ed. 2d 197, 98 S. Ct. 2340 (1978). Separate geographic accounting is not constitutionally required for the purpose of state taxation; attempts to isolate income received from various states may fail to account for intangible contributions. *Mobil*, at 438. Therefore, Washington's B & O tax is sufficiently apportioned for the purposes of the commerce clause.

■ The third prong of the *Complete Auto Transit* test is the requirement that the tax not discriminate against interstate commerce. A state tax on interstate commerce is not discriminatory unless it affords a "differential tax treatment of interstate and intrastate commerce". *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 618, 69 L. Ed. 2d 884, 101 S. Ct. 2946 (1981); *Maryland v. Louisiana*, 451 U.S. 725, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981). Washington's tax treats intrastate and interstate businesses equally, making no distinction between them. *See* RCW 82.04. Both intrastate and interstate businesses are taxed only once on their gross proceeds, not separately for each transaction as a manufacturer, wholesaler, or retailer. RCW 82.04.440.

CBI argues, however, that it is discriminated against because it is subject to the risk of double taxation: taxation by the state where the product is manufactured, as well as

taxation by Washington for the sale. Recent cases have indicated, however, that a "risk" of multiple taxation is not sufficient grounds for declaring a tax unconstitutional. *See Mobil Oil Corp. v. Commissioner of Taxes, supra; Exxon Corp. v. Department of Rev., supra.*

While CBI paid taxes in other states under formulas based on net income, as well as Washington's tax based on the gross proceeds of sale, the actual duplication of taxes was, by CBI's own calculations, minimal. More importantly, the commerce clause does not prohibit such overlaps in the computation of taxable income by the states. *Moorman Mfg. Co. v. Bair,* at 278. If the constitution were read to mandate precision, the judiciary would be required to impose national, uniform rules for the division of income. This the United States Supreme Court has expressly declined to do. *Moorman,* at 278–81. Instead, the Court has recognized the freedom of states to formulate independent policies, together with their potential for overlap, until such time as Congress determines the need for uniformity and enacts, under its power granted by the commerce clause, the appropriate legislation. *Moorman,* at 280. Likewise, we see no need to strike down our own state's taxing system, as it is constitutionally valid, simply because it is not in conformity with other states' schemes.

CBI's position is articulated in dissenting opinions of some United States Supreme Court Justices. Justice Brennan has argued that a tax on the gross receipts from an activity of which only part occurred within the taxing state's border is not fairly apportioned. *General Motors Corp. v. Washington,* 377 U.S. 436, 450–51, 12 L. Ed. 2d 430, 84 S. Ct. 1564 (1964) (Brennan, J., dissenting). Justice Powell believes the use of a tax different from those used by other states does, in practical effect, discriminate against interstate commerce. *Moorman,* at 288–89 (Powell, J., dissenting). He also believes it appropriate for the Court to invalidate states' statutes that burden interstate commerce by virtue of their nonconformity with other states' regulations. *Moorman,* at 293–97 (Powell, J., dissenting).

Nevertheless, it is the view of the majority that is controlling. In *Moorman,* the majority unequivocally stated that exact precision and conformity in taxation is not required. It recognized that some risk of duplicative taxation exists "whenever the States in which a corporation does business do not follow identical rules". *Moorman,* at 278. Yet its conclusion was that as long as a state's tax formula treats both local and interstate commerce alike, the alleged disparity in taxes borne by interstate businesses is the consequence of the *combined* effect of different states' laws, and is not attributed to any particular state's statutes. *Moorman,* at 277 n.12. On this basis, we hold here that Washington's B & O tax is not discriminatory under the commerce clause.

 The fourth and final prong, the requirement that the tax be fairly related to the services provided by the state, is easily met. This requirement does not address the rate or amount of the tax, nor does it look to the actual value of the services in relation to the actual taxable activities engaged in. *Commonwealth Edison Co. v. Montana,* at 622. Instead, it is closely connected to the first prong, the nexus requirement. *Commonwealth Edison Co. v. Montana, supra.* It requires that the measure of the tax, as well as its incidence, be "'tied to the earnings which the State . . . has made possible'". *Commonwealth Edison,* at 626, quoting *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 446, 85 L. Ed. 267, 61 S. Ct. 246, 130 A.L.R. 1229 (1940).

That tie exists here. In addition to the presence of an office in Seattle, a warehouse in Tacoma, and full- and part-time personnel at the installation sites of CBI's products, CBI uses Washington roads and transportation facilities, and all the government services associated with a large scale construction project each time it sells a product to a Washington consumer. Services provided by the State also include police and fire protection, the presence of a trained work force, and the general "advantages of a civilized society." *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 60 L. Ed. 2d 336, 99 S. Ct. 1813 (1979). All

such services are properly considered under the commerce clause. *Japan Line, Ltd. v. County of Los Angeles, supra.* As the *measure* of the B & O tax is based solely on gross proceeds of sales to customers in this state, it is closely "tied" to the earnings which the State has made possible.

 Finding all four prongs of the *Complete Auto Transit* test satisfied, we hold that Washington's B & O tax is constitutional under the commerce clause.

## IV

In matters involving the federal constitution, the State Supreme Court is bound to follow the decisions of the United States Supreme Court. *See B.F. Goodrich Co. v. State,* 38 Wn.2d 663, 676, 231 P.2d 325 (1951). Nonetheless, our previous cases are consistent with the result reached herein.

In *B.F. Goodrich,* this court followed the then recent decision of *Norton Co. v. Department of Rev.,* 340 U.S. 534, 95 L. Ed. 517, 71 S. Ct. 377 (1951) to hold that income from orders sent directly to an out-of-state manufacturer, with shipment made directly to the consumer in return, was not reasonably attributed to the local business, and hence was not subject to Washington's B & O tax. CBI views *B.F. Goodrich* as favoring its position, for we stated therein that "such a tax may not be levied upon the proceeds from sales with which the local outlet had nothing to do." *B.F. Goodrich,* at 675. CBI analogizes that its Seattle sales office was not involved in the procurement of the contracts here.

We do not, however, read the term "local outlet" so narrowly. In *Standard Pressed Steel Co. v. Department of Rev.,* 419 U.S. 560, 42 L. Ed. 2d 719, 95 S. Ct. 706 (1975), an employee without a local "office" who consulted with the local customer, addressed any difficulties with the product, and imparted goodwill which contributed to establishing and holding the market represented a sufficient nexus with the State to permit a B & O tax on sales to the local customer, even though the employee was not directly involved in placing, filling or receiving the orders. Similarly, CBI's

activities in this state are inexorably entwined with the establishing and holding of the local market. The sum of its activities are certainly equivalent, for taxing purposes, to the involvement of a "local outlet."

In *Fibreboard Paper Prods. Corp. v. State,* 66 Wn.2d 87, 401 P.2d 623 (1965), appellants made an argument substantially similar to the one made by CBI. *Fibreboard* demonstrated that a number of sales made to in–state customers involved sales activities with out–of–state offices of the corporate customer. *Fibreboard,* at 91–92. Hence, *Fibreboard* argued, the percentage of its sales activities taking place out of state was exempt from the B & O tax based on the privilege of engaging in business activities in state. This argument was rejected, however, under the reasoning of *General Motors Corp. v. State,* 60 Wn.2d 862, 376 P.2d 843 (1962), *aff'd,* 377 U.S. 436, 12 L. Ed. 2d 430, 84 S. Ct. 1564 (1964). *General Motors* placed the burden on a taxpayer with business activities within the state to show other activities allegedly immune from taxation are "disassociated from the sales in question." *General Motors,* at 875. *Fibreboard* did not sustain this burden, nor did CBI.

Finally, *Time Oil Co. v. State,* 79 Wn.2d 143, 483 P.2d 628 (1971) is consistent with recent United States Supreme Court cases that look to the substance rather than the form of the business' activities to determine the validity of a tax on interstate business. *See Mobil Oil Corp. v. Commissioner of Taxes, supra; Exxon Corp. v. Department of Rev., supra.* The focus in the *Time Oil* case, as it is here, was "whether the transactions involved constitute a taxable business activity within the contemplation of the business and occupation tax statutes." *Time Oil,* at 146. This court concluded that "the legislature intended to impose the business and occupation tax upon virtually all business activities carried on within the state." *Time Oil,* at 146. That same conclusion is valid today.

## V

To summarize, we find Washington's B & O tax on the privilege of doing business in Washington constitutionally valid under state and federal due process clauses and under the federal commerce clause. We also find the tax, as applied to CBI herein, meets the constitutional prerequisites for a tax on interstate business. We affirm.

WILLIAMS, C.J., and ROSELLINI, STAFFORD, UTTER, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., concur.