# TYLER PIPE INDUSTRIES, INC. *v.* WASHINGTON STATE DEPARTMENT OF REVENUE

No. 85–1963.   Argued March 2; 1987—Decided June 23, 1987*

---

*Together with No. 85–2006, *National Can Corp. et al.* v. *Washington State Department of Revenue*, also on appeal from the same court.

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, and O'CONNOR, JJ., joined, and in Part

IV of which SCALIA, J., joined. O'CONNOR, J., filed a concurring opinion, *post*, p. 253. SCALIA, J., filed an opinion concurring in part and dissenting in part, in Part I of which REHNQUIST, C. J., joined, *post*, p. 254. POWELL, J., took no part in the consideration or decision of the cases.

*Neil J. O'Brien* argued the cause for appellant in No. 85–1963. With him on the briefs was *Peter J. Turner*. *D. Michael Young* argued the cause for appellants in No. 85–2006. With him on the briefs were *John T. Piper* and *Franklin G. Dinces*.

*William Berggren Collins*, Assistant Attorney General of Washington, argued the cause for appellee in both cases. With him on the brief were *Kenneth O. Eikenberry*, Attorney General, and *James R. Tuttle, Leland T. Johnson*, and *Timothy R. Malone*, Assistant Attorneys General.†

JUSTICE STEVENS delivered the opinion of the Court.

In *Armco Inc.* v. *Hardesty*, 467 U. S. 638 (1984), we held that West Virginia's gross receipts tax on the business of selling tangible property at wholesale discriminated against interstate commerce because it exempted local manufacturers. The principal question in these consolidated appeals is whether Washington's manufacturing tax similarly violates the Commerce Clause of the Constitution because it is assessed only on those products manufactured within Washington that are sold to out-of-state purchasers. We conclude that our reasons for invalidating the West Virginia tax in *Armco* also apply to the Washington tax challenged here.

I

For over half a century Washington has imposed a business and occupation (B & O) tax on "the act or privilege of engag-

---

†*E. Barrett Prettyman, Jr.*, and *John G. Roberts, Jr.*, filed a brief for Amcord, Inc., et al. as *amici curiae* urging reversal in No. 85–2006. *Jean A. Walker* filed a brief for the Committee on State Taxation of the Council of State Chambers of Commerce as *amicus curiae* urging reversal in both cases.

*Benna Ruth Solomon* and *Mark C. Rutzick* filed a brief for the National Governors' Association et al. as *amici curiae* urging affirmance.

ing in business activities" in the State. Wash. Rev. Code § 82.04.220 (1985). The tax applies to the activities of extracting raw materials in the State,[1] manufacturing in the State,[2] making wholesale sales in the State,[3] and making retail sales in the State.[4] The State has typically applied the same tax rates to these different activities. The measure of the selling tax is the "gross proceeds of sales," and the measure of the manufacturing tax is the value of the manufactured products. §§ 82.04.220, 82.04.240.

Prior to 1950, the B & O tax contained a provision that exempted persons who were subject to either the extraction tax or the manufacturing tax from any liability for either the wholesale tax or the retail tax on products extracted or manufactured in the State.[5] Thus, the wholesale tax applied to out-of-state manufacturers but not to local manufacturers. In 1948 the Washington Supreme Court held that this wholesale tax exemption for local manufacturers discriminated against interstate commerce and therefore violated the Commerce Clause of the Federal Constitution. *Columbia Steel Co.* v. *State*, 30 Wash. 2d 658, 192 P. 2d 976 (1948). The State Supreme Court rejected the State's argument that the taxpayer had not suffered from discrimination against interstate commerce because it had not proved that it paid manu-

---

[1] Wash. Rev. Code § 82.04.230 (1985).

[2] § 82.04.240.

[3] § 82.04.270.

[4] § 82.04.250.

[5] The statute provided:

" 'Every person engaging in activities which are within the purview of the provisions of two or more paragraphs (a), (b), (c), (d), (e), (f) and (g) of section 4 [§ 8370–4], shall be taxable under each paragraph applicable to the activities engaged in: *Provided, however, That persons taxable under paragraphs (a) or (b) of said section shall not be taxable under paragraphs (c) or (e) of said section with respect to making sales at retail or wholesale of products extracted or manufactured within this state by such persons'* (Italics ours)." See *Columbia Steel Co.* v. *State*, 30 Wash. 2d 658, 661, 192 P. 2d 976, 977–978 (1948).

facturing tax to another State.[6]   The Washington Supreme Court also dismissed the State's contention that if the State in which a good was manufactured did not impose a manufacturing tax, the seller of the good would have a competitive advantage over Washington manufacturers:

> "[T]he situation obtaining in another state is immaterial. We must interpret the statute as passed by the legislature.   In our opinion the statute marks a discrimination against interstate commerce in levying a tax upon wholesale activities of those engaged in interstate commerce, which tax is, because of the exemption contained in § 8370–6, not levied upon those who perform the same taxable act, but who manufacture in the state of Washington."   *Id.*, at 664, 192 P. 2d, at 979.

Two years later, in 1950, the Washington Legislature responded to this ruling by turning the B & O tax exemption scheme inside out.   The legislature removed the wholesale tax exemption for local manufacturers and replaced it with an exemption from the manufacturing tax for the portion of manufacturers' output that is subject to the wholesale tax.[7] The result, as before 1950, is that local manufacturers pay the manufacturing tax on their interstate sales and out-of-state manufacturers pay the wholesale tax on their sales in Washington.   Local manufacturer-wholesalers continue to

---

[6] "'The immunities implicit in the Commerce Clause and the potential taxing power of a State can hardly be made to depend, in the world of practical affairs, on the shifting incidence of the varying tax laws of the various States at a particular moment.   Courts are not possessed of instruments of determination so delicate as to enable them to weigh the various factors in a complicated economic setting which, as to an isolated application of a State tax, might mitigate the obvious burden generally created by a direct tax on commerce.'"   *Id.*, at 663, 192 P. 2d, at 978 (quoting *Freeman* v. *Hewit*, 329 U. S. 249, 256 (1946)).

[7] The Washington Supreme Court upheld this revised scheme against constitutional challenge in *B. F. Goodrich Co.* v. *State*, 38 Wash. 2d 663, 231 P. 2d 325, cert. denied, 342 U. S. 876 (1951).

pay only one gross receipts tax, but it is now applied to the activity of wholesaling rather than the activity of manufacturing. Although the tax rate has changed over the years — it is now forty-four hundredths of one percent, or 0.44%, of gross receipts — the relevant provisions of Washington's B & O tax are the same today as enacted in 1950.[8]

The constitutionality of the B & O tax has been challenged on several occasions,[9] most strenuously in *General Motors Corp.* v. *Washington*, 377 U. S. 436 (1964). In that case a bare majority of the Court upheld the tax; JUSTICE BRENNAN and Justice Goldberg filed dissenting opinions. The bulk of the Court's opinion was devoted to rejecting the claims that the statute unconstitutionally taxed unapportioned gross receipts and did not bear a reasonable relation to the taxpayer's in-state activities. At the end of its opinion, the Court declined to reach the argument that the tax imposed multiple tax burdens on interstate transactions, because the taxpayer had failed to demonstrate "what definite

---

[8] The multiple activities exemption provides:

"(1) [E]very person engaged in activities which are within the purview of the provisions of two or more of sections RCW 82.04.230 to 82.04.290, inclusive, shall be taxable under each paragraph applicable to the activities engaged in.

"(2) Persons taxable under RCW 82.04.250 [tax on retailers] or 82.04.270 [tax on wholesalers and distributors] shall not be taxable under RCW 82.04.230 [tax on extractors], 82.04.240 [tax on manufacturers] or subsection (2), (3), (4), (5), or (7) of RCW 82.04.260 [tax on certain food processing activities] with respect to extracting or manufacturing of the products so sold.

"(3) Persons taxable under RCW 82.04.240 or RCW 82.04.260 subsection (4) shall not be taxable under RCW 82.04.230 with respect to extracting the ingredients of the products so manufactured." Wash. Rev. Code § 82.04.440 (1985).

[9] See, *e. g.*, *B. F. Goodrich Co.* v. *State, supra; General Motors Corp.* v. *Washington*, 377 U. S. 436 (1964); *Standard Pressed Steel Co.* v. *Washington Dept. of Revenue*, 419 U. S. 560 (1975); *Chicago Bridge & Iron Co.* v. *Washington Dept. of Revenue*, 98 Wash. 2d 814, 659 P. 2d 463, appeal dism'd, 464 U. S. 1013 (1983).

burden, in a constitutional sense" other States' laws had placed on "the identical interstate shipments by which Washington measures its tax." *Id.*, at 449. Justice Goldberg, joined by Justice Stewart and JUSTICE WHITE, dissented because "[t]he burden on interstate commerce and the dangers of multiple taxation" were apparent from the face of the statute. *Id.*, at 459.[10] Comparing the current statute

---

[10]Justice Goldberg explained the functional equivalency for Commerce Clause purposes of the invalidated pre-1950 statute and its successor:

"The burden on interstate commerce and the dangers of multiple taxation are made apparent by considering Washington's tax provisions. The Washington provision here involved—the 'tax on wholesalers'—provides that every person 'engaging within this state in the business of making sales at wholesale' shall pay a tax on such business 'equal to the gross proceeds of sales of such business multiplied by the rate of one-quarter of one per cent.' Rev. Code Wash. 82.04.270; Wash. Laws 1949, c. 228, § 1 (e). In the same chapter Washington imposes a 'tax on manufacturers' which similarly provides that every person 'engaging within this state in business as a manufacturer' shall pay a tax on such business 'equal to the value of the products . . . manufactured, multiplied by the rate of one-quarter of one per cent.' Rev. Code Wash. 82.04.240; Wash. Laws 1949, c. 228, § 1 (b). Then in a provision entitled 'Persons taxable on multiple activities' the statute endeavors to insure that local Washington products will not be subjected both to the 'tax on manufacturers' and to the 'tax on wholesalers.' Rev. Code Wash. 82.04.440; Wash. Laws 1949, c. 228, § 2–A. Prior to its amendment in 1950 the exemptive terms of this 'multiple activities' provision were designed so that a Washington manufacturer-wholesaler would pay the manufacturing tax and be exempt from the wholesale tax. This provision, on its face, discriminated against interstate wholesale sales to Washington purchasers for it exempted the intrastate sales of locally made products while taxing the competing sales of interstate sellers. In 1950, however, the 'multiple activities' provision was amended, reversing the tax and the exemption, so that a Washington manufacturer-wholesaler would first be subjected to the wholesale tax and then, to the extent that he is taxed thereunder, exempted from the manufacturing tax. Rev. Code Wash. 82.04.440; Wash. Laws 1950 (special session), c. 5, § 2. See *McDonnell & McDonnell* v. *State*, 62 Wash. 2d 553, 557, 383 P. 2d 905, 908. This amended provision would seem to have essentially the same economic effect on interstate sales but has the advantage of appearing nondiscriminatory." *General Motors Corp.* v. *Washington*, 377 U. S., at 459–460 (dissenting opinion).

with its invalid predecessor, this dissent concluded that the "amended provision would seem to have essentially the same economic effect on interstate sales but has the advantage of appearing nondiscriminatory." *Id.*, at 460. Today we squarely address the claim that this provision discriminates against interstate commerce.

## II

Two appeals are before us. In the first case (No. 85–2006), 71 commercial enterprises filed 53 separate actions for refunds of B & O taxes paid to the State. The Thurston County Superior Court joined the actions, found that the multiple activities exemption did not violate the Commerce Clause, and granted the State Department of Revenue's motion for summary judgment. In the second case (No. 85–1963), Tyler Pipe Industries, Inc. (Tyler), sought a refund of B & O taxes paid during the years 1976 through 1980 for its wholesaling activities in Washington. Again, the Superior Court upheld the B & O tax. The Washington Supreme Court affirmed in both cases. 105 Wash. 2d 327, 732 P. 2d 134 (1986); 105 Wash. 2d 318, 715 P. 2d 123 (1986).

The State Supreme Court concluded that the B & O tax was not facially discriminatory and rejected the appellants' arguments that our decision invalidating West Virginia's exemption for local wholesaler-manufacturers, *Armco Inc.* v. *Hardesty*, 467 U. S. 638 (1984), required that the B & O tax be invalidated. The state court expressed the view that the West Virginia wholesale tax imposed on out-of-state manufacturers in *Armco* could not be justified as a compensating tax because of the substantial difference between the State's tax rates on manufacturing activities (.0088) and wholesaling activities (.0027), and because West Virginia did not provide for a reduction in its manufacturing tax when the manufactured goods were sold out of State, but did reduce the tax when the goods were partly manufactured out of State. The Washington Supreme Court then concluded that our require-

ment that a tax must have "'what might be called internal consistency—that is the [tax] must be such that, if applied by every jurisdiction,' there would be no impermissible interference with free trade," *Armco*, 467 U. S., at 644, was not dispositive because it merely relieved the taxpayer of the burden of proving that a tax already demonstrated to be facially discriminatory had in fact resulted in multiple taxation. The Washington Supreme Court also rejected the taxpayers' arguments that the B & O tax is not fairly apportioned to reflect the amount of business conducted in the State and is not fairly related to the services rendered by Washington.

We noted probable jurisdiction of the taxpayers' appeals, 479 U. S. 810 (1986), and now reverse in part and affirm in part. We first consider the claims of the taxpayers that have manufacturing facilities in Washington and market their products in other States; their challenge is directed to the fact that the manufacturing tax is levied only on those goods manufactured in Washington that are sold outside the State. We then consider Tyler's claims that its activities in the State of Washington are not sufficient to subject it to the State's taxing jurisdiction and that the B & O tax is not fairly apportioned.

### III

A person subject to Washington's wholesale tax for an item is not subject to the State's manufacturing tax for the same item. This statutory exemption for manufacturers that sell their products within the State has the same facially discriminatory consequences as the West Virginia exemption we invalidated in *Armco*. West Virginia imposed a gross receipts tax at the rate of 0.27% on persons engaged in the business of selling tangible property at wholesale. Local manufacturers were exempt from the tax, but paid a manufacturing tax of 0.88% on the value of products manufactured in the State. Even though local manufacturers bore a higher tax burden in dollars and cents, we held that their exemption from the wholesale tax violated the principle that "a State may not tax

a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." 467 U. S., at 642.

In explaining why the tax was discriminatory on its face, we expressly endorsed the reasoning of Justice Goldberg's dissenting opinion in *General Motors Corp.* v. *Washington,* 377 U. S., at 459. We explained:

"The tax provides that two companies selling tangible property at wholesale in West Virginia will be treated differently depending on whether the taxpayer conducts manufacturing in the State or out of it. Thus, if the property was manufactured in the State, no tax on the sale is imposed. If the property was manufactured out of the State and imported for sale, a tax of 0.27% is imposed on the sale price. See *General Motors Corp.* v. *Washington,* 377 U. S. 436, 459 (1964) (Goldberg, J., dissenting) (similar provision in Washington, 'on its face, discriminated against interstate wholesale sales to Washington purchasers for it exempted the intrastate sales of locally made products while taxing the competing sales of interstate sellers'); *Columbia Steel Co.* v. *State,* 30 Wash. 2d 658, 664, 192 P. 2d 976, 979 (1948) (invalidating Washington tax)." 467 U. S., at 642.

Our square reliance in *Armco* on Justice Goldberg's earlier dissenting opinion is especially significant because that dissent dooms appellee's efforts to limit the reasoning of *Armco* to the precise statutory structure at issue in that case. Justice Goldberg expressly rejected the distinction appellee attempts to draw between an exemption from a wholesaling tax—as was present in *Armco*—and the exemption from a manufacturing tax which was present in *General Motors* and is again present in these cases. See 377 U. S., at 459–460. Our holding in *Armco* requires that we now agree with Justice Goldberg's conclusion that the exemption before us is the practical equivalent of the exemption that the Washington Supreme Court invalidated in 1948.

*General Motors* is not a controlling precedent. As we have already noted, the result in that case did not depend on the Court's resolution of whether the tax burdened interstate commerce. Our reason for not passing on that question was that the taxpayer had "not demonstrated what definite burden, in a constitutional sense [the tax imposed by other States] places on the identical shipments by which Washington measures its tax." 377 U. S., at 449. Thus, when *General Motors* was decided, the Court required the taxpayer to prove that specific interstate transactions were subjected to multiple taxation in order to advance a claim of discrimination. See also *Standard Pressed Steel Co.* v. *Washington Revenue Dept.*, 419 U. S. 560, 563 (1975) (rejecting Commerce Clause claim because taxpayer made no showing of risk of multiple taxation). In *Armco*, however, we categorically rejected this requirement. The facial unconstitutionality of Washington's gross receipts tax cannot be alleviated by examining the effect of legislation enacted by its sister States. See *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267, 276–278 (1978).[11]

We also reject the Department's contention that the State's imposition of the manufacturing tax on local goods sold outside the State should be saved as a valid "compensating tax." As we noted in *Maryland* v. *Louisiana*, 451 U. S. 725, 758 (1981), the "concept of a compensatory tax first requires identification of the burden for which the State is attempting to compensate." In these cases the only bur-

---

[11] In *Armco Inc.* v. *Hardesty*, 467 U. S. 638 (1984), we quoted with approval the following sentence from the Court's opinion in *Freeman* v. *Hewit*, 329 U. S., 249, 256 (1946):

"The immunities implicit in the Commerce Clause and the potential taxing power of a State can hardly be made to depend, in the world of practical affairs, on the shifting incidence of the varying tax laws of the various States at a particular moment." See 467 U. S., at 645, n. 8.

The Washington Supreme Court also relied on *Freeman* v. *Hewit* in *Columbia Steel Co.* v. *State*, 30 Wash. 2d, at 663, 192 P. 2d, at 978.

den for which the manufacturing tax exemption is arguably compensatory is the State's imposition of a wholesale tax on the local sales of local manufacturers; absent the exemption, a local manufacturer might be at an economic disadvantage because it would pay both a manufacturing and a wholesale tax, while the manufacturer from afar would pay only the wholesale tax. The State's justification for thus taxing the manufacture of goods in interstate commerce, however, fails under our precedents. The local sales of out-of-state manufacturers are also subject to Washington's wholesale tax, but the multiple activities exemption does not extend its ostensible compensatory benefit to those manufacturers. The exemption thus does not merely erase a tax incentive to engage in interstate commerce instead of intrastate commerce; it affirmatively places interstate commerce at a disadvantage.

"[T]he common theme running through the cases in which this Court has sustained compensating" taxes is "[e]qual treatment of interstate commerce." *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318, 331 (1977). See also *Maryland* v. *Louisiana*, 451 U. S., at 759. In *Boston Stock Exchange*, a New York transfer tax on securities transactions taxed transactions involving an out-of-state sale more heavily than other transactions involving an in-state sale. We invalidated the tax, rejecting the State's claim that it was compensatory legislation designed to neutralize the competitive advantage enjoyed by stock exchanges outside New York. We concluded:

> "Because of the delivery or transfer in New York, the seller cannot escape tax liability by selling out of State, but he can substantially reduce his liability by selling in State. The obvious effect of the tax is to extend a financial advantage to sales on the New York exchanges at the expense of the regional exchanges. Rather than 'compensating' New York for a supposed competitive disadvantage resulting from § 270, the amendment forecloses tax-neutral decisions and creates both an ad-

vantage for the exchanges in New York and a discriminatory burden on commerce to its sister States." 429 U. S., at 331.

Similarly, in *Maryland* v. *Louisiana*, we held that a tax on the first use in Louisiana of gas brought into the State was not a "complement of a severance tax in the same amount imposed on gas produced within the State." *Armco*, 467 U. S., at 642–643, citing *Maryland* v. *Louisiana*, 451 U. S., at 758–759. We relied on the observation that severance and first use were not "substantially equivalent" events on which mutually compensating taxes might be imposed. And in *Armco* we squarely held that manufacturing and wholesaling are not substantially equivalent activities. As we wrote in that case:

> "The gross sales tax imposed on Armco cannot be deemed a 'compensating tax' for the manufacturing tax imposed on its West Virginia competitors. . . . Here, too, manufacturing and wholesaling are not 'substantially equivalent events' such that the heavy tax on in-state manufacturers can be said to compensate for the admittedly lighter burden placed on wholesalers from out of State. Manufacturing frequently entails selling in the State, but we cannot say which portion of the manufacturing tax is attributable to manufacturing, and which portion to sales." 467 U. S., at 642–643.

See also *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 272 (1984). In light of the facially discriminatory nature of the multiple activities exemption, we conclude, as we did in *Armco*, that manufacturing and wholesaling are not "substantially equivalent events" such that taxing the manufacture of goods sold outside the State can be said to compensate for the State's inability to impose a wholesale tax on those goods.[12]

---

[12] Nor may the tax be justified as an attempt to compensate the State for its inability to impose a similar burden on out-of-state manufacturers

Appellee also contends that its B & O tax is valid because of its asserted similarities to a tax and exemption system we have upheld. The State assessed a use tax on personal property used within the State but originally purchased elsewhere to compensate for the burden that a sales tax placed on similar property purchased within the State. See *Henneford* v. *Silas Mason Co.*, 300 U. S. 577 (1937). Appellee's reliance on *Henneford* v. *Silas Mason Co.*, however, does not aid its cause. That case addressed a use tax imposed by the State of Washington on the "privilege of using within this state any article of tangible personal property." The tax did not apply to "the use of any article of tangible personal property" the sale or use of which had already been taxed at an equal or greater rate under the laws of Washington or some other State. *Id.*, at 580–581. We upheld the tax because, in the context of the overall tax structure, the burden it placed on goods purchased out-of-state was identical to that placed on an equivalent purchase within the State. This identical impact was no fortuity; it was guaranteed by the statutory exemption from the use tax for goods on which a sales tax had already been paid,[13] regardless of whether the sales tax had been paid to Washington or to another State.[14]

---

whose goods are sold in Washington, for Washington subjects those sales to wholesale tax.

[13] Many States provide tax credits that alleviate or eliminate the potential multiple taxation that results when two or more sovereigns have jurisdiction to tax parts of the same chain of commercial events. For example, the District of Columbia and all but three States with sales and use taxes provide a credit against their own use taxes for sales taxes paid to another State, although reciprocity may be required. See CCH State Tax Guide 6013–6014 (1986); *Williams* v. *Vermont*, 472 U. S. 14, 22 (1985). See also *Halliburton Oil Well Cementing Co.* v. *Reily*, 373 U. S. 64, 74–75 (1963).

[14] In his opinion for the Court in *Henneford* v. *Silas Mason Co.*, Justice Cardozo carefully described the relationship between the 2% "tax on retail sales" imposed by Title III of Washington's 1935 tax code and the "compensating tax" imposed by Title IV on the privilege of use. The compensating use tax was imposed on the use of an article of tangible personal property which had been purchased at retail but had not been subjected to

As we explained in *Halliburton Oil Well Cementing Co.* v. *Reily,* 373 U. S. 64, 70 (1963):

> "The conclusion is inescapable: equal treatment for in-state and out-of-state taxpayers similarly situated is the condition precedent for a valid use tax on goods imported from out-of-state."

The parallel condition precedent for a valid multiple activities exemption eliminating exposure to the burden of a multiple tax on manufacturing and wholesaling would provide a credit against Washington tax liability for wholesale taxes paid by local manufacturers to any State, not just Washington. The multiple activities exemption only operates to impose a unified tax eliminating the risk of multiple taxation when the acts of manufacturing and wholesaling are both carried out within the State. The exemption excludes similarly situated manufacturers and wholesalers which conduct one of those activities within Washington and the other activity out-

a sales tax that was equal to or in excess of that imposed by the State of Washington. If the rate of the tax imposed by another jurisdiction was less than 2%, the rate of the compensating tax was measured by the difference. Explaining why such a compensating tax does not discriminate against interstate commerce, Justice Cardozo wrote:

"Equality is the theme that runs through all the sections of the statute. There shall be a tax upon the use, but subject to an offset if another use or sales tax has been paid for the same thing. This is true where the offsetting tax became payable to Washington by reason of purchase or use within the state. *It is true in exactly the same measure where the offsetting tax has been paid to another state by reason of use or purchase there.* No one who uses property in Washington after buying it at retail is to be exempt from a tax upon the privilege of enjoyment except to the extent that he has paid a use or sales tax somewhere. Every one who has paid a use or sales tax anywhere, or, more accurately, in any state, is to that extent to be exempt from the payment of another tax in Washington.

"When the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed." 300 U. S., at 583–584 (emphasis added).

side the State. Washington's B & O tax scheme is therefore inconsistent with our precedents holding that a tax violates the Commerce Clause "when it unfairly burdens commerce by exacting more than a just share from the interstate activity." *Washington Dept. of Revenue* v. *Association of Washington Stevedoring Cos.*, 435 U. S. 734, 748 (1978).

As we explained in *Armco*, our conclusion that a tax facially discriminates against interstate commerce need not be confirmed by an examination of the tax burdens imposed by other States:

> "Appellee suggests that we should require Armco to prove actual discriminatory impact on it by pointing to a State that imposes a manufacturing tax that results in a total burden higher than that imposed on Armco's competitors in West Virginia. This is not the test. In *Container Corp. of America* v. *Franchise Tax Board*, 463 U. S. 159, 169 (1983), the Court noted that a tax must have 'what might be called internal consistency—that is the [tax] must be such that, if applied by every jurisdiction,' there would be no impermissible interference with free trade. In that case, the Court was discussing the requirement that a tax be fairly apportioned to reflect the business conducted in the State. A similar rule applies where the allegation is that a tax on its face discriminates against interstate commerce. A tax that unfairly apportions income from other States is a form of discrimination against interstate commerce. See also *id.*, at 170–171. Any other rule would mean that the constitutionality of West Virginia's tax laws would depend on the shifting complexities of the tax codes of 49 other States, and that the validity of the taxes imposed on each taxpayer would depend on the particular other States in which it operated." 467 U. S., at 644–645 (footnote omitted).[15]

---

[15] Even the solitary dissenting opinion in the *Armco* case did not question the proposition that the constitutionality of the West Virginia tax

We conclude that Washington's multiple activities exemption discriminates against interstate commerce as did the tax struck down by the Washington Supreme Court in 1948 and the West Virginia tax that we invalidated in *Armco*.   The current B & O tax exposes manufacturing or selling activity outside the State to a multiple burden from which only the activity of manufacturing in-state and selling in-state is exempt.   The fact that the B & O tax "has the advantage of appearing nondiscriminatory," see *General Motors Corp.*, 377 U. S., at 460 (Goldberg, J., dissenting), does not save it from invalidation.   To the extent that this conclusion is inconsistent with the Court's ruling in the *General Motors* case, that case is overruled.[16]

## IV

Our holding that Washington's tax exemption for a local manufacturer-wholesaler violates the Commerce Clause disposes of the issues raised by those appellants in *National Can* that manufacture goods in Washington and sell them outside the State, as well as the claim of discrimination asserted by those appellants that manufacture goods outside Washington and sell them within the State.   Compliance

could properly be discerned merely by referring to the text of the tax statute itself:

"It is plain that West Virginia's tax would be unconstitutionally discriminatory if it levied no tax on manufacturing or taxed manufacturing at a lower rate than wholesaling, for then the out-of-state wholesaler would be paying a higher tax than the in-state manufacturer-wholesaler."   467 U. S., at 646 (REHNQUIST, J., dissenting).

Instead, the dissent argued that West Virginia's taxing scheme, taken in its entirety, did not discriminate against out-of-state manufacturers because the manufacturing tax paid by a local manufacturer-wholesaler was much higher than the wholesale tax exacted from an out-of-state manufacturer.

[16] In view of our holding on the discrimination issue, we need not reach the claim of local state manufacturers selling to interstate markets that the tax scheme does not fairly apportion tax liabilities between Washington and other States.

with our holding on the discrimination issue, however, would not necessarily preclude the continued assessment of a wholesaling tax. Either a repeal of the manufacturing tax or an expansion of the multiple activities exemption to provide out-of-state manufacturers with a credit for manufacturing taxes paid to other States would presumably cure the discrimination. We must therefore also consider the alternative challenge to the wholesale tax advanced by Tyler and the other appellants that manufacture products outside of Washington for sale in the State.

Tyler seeks a refund of wholesale taxes it paid on sales to customers in Washington for the period from January 1, 1976, through September 30, 1980. These products were manufactured outside of Washington. Tyler argues that its business does not have a sufficient nexus with the State of Washington to justify the collection of a gross receipts tax on its sales. Tyler sells a large volume of cast iron, pressure and plastic pipe and fittings, and drainage products in Washington, but all of those products are manufactured in other States. Tyler maintains no office, owns no property, and has no employees residing in the State of Washington. Its solicitation of business in Washington is directed by executives who maintain their offices out-of-state and by an independent contractor located in Seattle.

The trial court found that the in-state sales representative engaged in substantial activities that helped Tyler to establish and maintain its market in Washington. The State Supreme Court concluded that those findings were supported by the evidence, and summarized them as follows:

> "The sales representatives acted daily on behalf of Tyler Pipe in calling on its customers and soliciting orders. They have long-established and valuable relationships with Tyler Pipe's customers. Through sales contacts, the representatives maintain and improve the name recognition, market share, goodwill, and individual customer relations of Tyler Pipe.

"Tyler Pipe sells in a very competitive market in Washington. The sales representatives provide Tyler Pipe with virtually all their information regarding the Washington market, including: product performance; competing products; pricing, market conditions and trends; existing and upcoming construction products; customer financial liability; and other critical information of a local nature concerning Tyler Pipe's Washington market. The sales representatives in Washington have helped Tyler Pipe and have a special relationship to that corporation. The activities of Tyler Pipe's agents in Washington have been substantial." 105 Wash. 2d, at 325, 715 P. 2d, at 127.

As a matter of law, the Washington Supreme Court concluded that this showing of a sufficient nexus could not be defeated by the argument that the taxpayer's representative was properly characterized as an independent contractor instead of as an agent. We agree with this analysis. In *Scripto, Inc.* v. *Carson,* 362 U. S. 207 (1960), Scripto, a Georgia corporation, had no office or regular employees in Florida, but it employed wholesalers or jobbers to solicit sales of its products in Florida. We held that Florida may require these solicitors to collect a use tax from Florida customers. Although the "salesmen" were not employees of Scripto, we determined that "such a fine distinction is without constitutional significance." *Id.,* at 211. This conclusion is consistent with our more recent cases. See *National Geographic Society* v. *California Equalization Board,* 430 U. S. 551, 556–558 (1977).

As the Washington Supreme Court determined, "the crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales." 105 Wash. 2d, at 323, 715 P. 2d, at 126. The court found this standard was

satisfied because Tyler's "sales representatives perform any local activities necessary for maintenance of Tyler Pipe's market and protection of its interests . . . ." *Id.*, at 321, 715 P. 2d, at 125. We agree that the activities of Tyler's sales representatives adequately support the State's jurisdiction to impose its wholesale tax on Tyler.

Tyler also asserts that the B & O tax does not fairly apportion the tax burden between its activities in Washington and its activities in other States. See *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274, 285 (1977). Washington taxes the full value of receipts from in-state wholesaling or manufacturing; thus, an out-of-state manufacturer selling in Washington is subject to an unapportioned wholesale tax even though the value of the wholesale transaction is partly attributable to manufacturing activity carried on in another State that plainly has jurisdiction to tax that activity. This apportionment argument rests on the erroneous assumption that through the B & O tax, Washington is taxing the unitary activity of manufacturing and wholesaling. We have already determined, however, that the manufacturing tax and wholesaling tax are not compensating taxes for substantially equivalent events in invalidating the multiple activities exemption. Thus, the activity of wholesaling—whether by an in-state or an out-of-state manufacturer—must be viewed as a separate activity conducted wholly within Washington that no other State has jurisdiction to tax. See *Moorman Mfg. Co.* v. *Bair*, 437 U. S., at 280–281 (gross receipts tax on sales to customers within State would be "plainly valid"); *Standard Pressed Steel Co.* v. *Washington Revenue Dept.*, 419 U. S., at 564 (selling tax measured by gross proceeds of sales is "apportioned exactly to the activities taxed").

## V

The Department of Revenue argues that any adverse decision in these cases should not be applied retroactively because the taxes at issue were assessed prior to our opinion in

*Armco* and the holding in that case was not clearly foreshad-owed by earlier opinions. See *Chevron Oil Co.* v. *Huson*, 404 U. S. 97, 106–107 (1971) (factors to consider in deciding whether to impose decision prospectively only). The State's argument is similar to an argument advanced by the State of Hawaii in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S., at 276–277. The State urged that, if we invalidated the tax at issue, we should not require the payment of refunds to tax-payers. We did not resolve the merits of that issue, conclud-ing that this Court should not take it upon itself in this com-plex area of state tax structures to determine how to apply its holding:

> "These refund issues, which are essentially issues of remedy for the imposition of a tax that unconstitutionally discriminated against interstate commerce, were not ad-dressed by the state courts. Also, the federal constitu-tional issues involved may well be intertwined with, or their consideration obviated by, issues of state law. Also, resolution of those issues, if required at all, may necessitate more of a record than so far has been made in this case. We are reluctant, therefore, to address them in the first instance. Accordingly, we reverse the judg-ment of the Supreme Court of Hawaii and remand for further proceedings not inconsistent with this opinion." *Id.*, at 277 (footnote omitted).

We followed this approach in *Williams* v. *Vermont*, 472 U. S. 14 (1985), an opinion which invalidated the State's resi-dency restriction on the availability of a sales tax credit for use tax paid to another State. We expressed no opinion on the appropriate remedy, instead remanding to the Supreme Court of Vermont "in light of the fact that the action was dis-missed on the pleadings, and given the possible relevance of state law, see *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 277 (1984) . . . ." *Id.*, at 28. Cf. *Hooper* v. *Bernalillo County Assessor*, 472 U. S. 612, 622–623 (1985). We con-

clude that it is likewise appropriate for the Supreme Court of Washington to address in the first instance the refund issues raised by our rulings in these cases.

## VI

We hold Washington's multiple activities exemption invalid because it places a tax burden upon manufacturers in Washington engaged in interstate commerce from which local manufacturers selling locally are exempt. We reject appellant Tyler's nexus and fair apportionment challenges to the State's wholesale tax. Our partial invalidation of the State's taxing scheme raises remedial issues that are better addressed by the State Supreme Court on remand. Accordingly, we vacate the judgments of the Supreme Court of Washington and remand for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE POWELL took no part in the consideration or decision of these cases.

JUSTICE O'CONNOR, concurring.

I join the Court's opinion holding that "[i]n light of the facially discriminatory nature of the multiple activities exemption," *ante*, at 244, see *Maryland* v. *Louisiana*, 451 U. S. 725, 756–757 (1981), the Washington taxpayers need not prove actual discriminatory impact "by an examination of the tax burdens imposed by other States." *Ante*, at 247. I do not read the Court's decision as extending the "internal consistency" test described in *Armco Inc.* v. *Hardesty*, 467 U. S. 638, 644–645 (1984), to taxes that are not facially discriminatory, contra, *post*, at 257–258 (SCALIA, J., concurring in part and dissenting in part), nor would I agree with such a result in these cases. See *American Trucking Assns., Inc.* v. *Scheiner*, *post*, p. 298 (O'CONNOR, J., dissenting).

JUSTICE SCALIA, with whom THE CHIEF JUSTICE joins in Part I, concurring in part and dissenting in part.

I join Part IV of the Court's opinion, upholding Washington's unapportioned wholesale tax and rejecting Tyler Pipe's claim that it did not have a sufficient nexus with Washington to give the State taxing jurisdiction. I dissent, however, from the remainder of the opinion, invalidating the State's manufacturing tax as unconstitutionally discriminatory under the Commerce Clause. The standard for discrimination adopted by the Court, which drastically limits the States' discretion to structure their tax systems, has no basis in the Constitution, and is not required by our past decisions.

## I

Implicitly in these cases, *ante*, at 245–248, and explicitly in *American Trucking Assns., Inc.* v. *Scheiner, post*, at 284, the Court imposes on state taxes a requirement of "internal consistency," demanding that they " 'be such that, if applied by every jurisdiction,' there would be no impermissible interference with free trade." *Armco Inc.* v. *Hardesty*, 467 U. S. 638, 644 (1984) (quoting *Container Corp. of America* v. *Franchise Tax Board*, 463 U. S. 159, 169 (1983)).[1] It is clear, for the reasons given by the Court, *ante*, at 246–247, that the Washington business and occupation (B & O) tax fails that test. So would any unapportioned flat tax on multistate activities, such as the axle tax or marker fee at issue in *Scheiner, post*, p. 266. It is equally clear to me, however, that this internal consistency principle is nowhere to be found in the Constitution. Nor is it plainly required by our prior decisions. Indeed, in order to apply the internal consistency

---

[1] The majority finds Washington's manufacturing tax exemption for local wholesalers discriminatory because it "excludes similarly situated manufacturers and wholesalers which conduct one of those activities within Washington and the other activity outside the State." *Ante*, at 246–247. That exclusion, however, can only be deemed *facially* discriminatory if one assumes that every State's taxing scheme is identical to Washington's.

rule in this case, the Court is compelled to overrule a rather lengthy list of prior decisions, from *Hinson* v. *Lott*, 8 Wall. 148 (1869), to *General Motors Corp.* v. *Washington*, 377 U. S. 436 (1964), and including, as is made explicit in *Scheiner, post,* p. 266, *Capitol Greyhound Lines* v. *Brice*, 339 U. S. 542 (1950), *Aero Mayflower Transit Co.* v. *Board of Railroad Comm'rs*, 332 U. S. 495 (1947), and *Aero Mayflower Transit Co.* v. *Georgia Public Service Comm'n*, 295 U. S. 285 (1935). Moreover, the Court must implicitly repudiate the approval given in dicta 10 years ago to New York's pre-1968 transfer tax on securities. See *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318, 330 (1977).[2] Finally, we noted only two Terms ago—and one Term after *Armco, supra*, was decided—that we had never held that "a State must credit a sales tax paid to another State against its own use tax." *Williams* v. *Vermont*, 472 U. S. 14, 21–22 (1985). See *Southern Pacific Co.* v. *Gallagher*, 306 U. S. 167, 172 (1939). If we had applied an internal consistency rule at that time, the need for such a credit would have followed as a matter of mathematical necessity. The Court's presumed basis for creating this rule now, 198 years after adoption of the Constitution, is that the reasoning of *Armco* requires it. See *Scheiner, post,* at 284. In my view, however, that reasoning was dictum, which we should explicitly reject. And if one insists on viewing it as holding, and thus

---

[2] The New York statute taxed, *inter alia*, both the sale and delivery of securities if either event occurred in New York, 429 U. S., at 321, but imposed only one tax if both events occurred in that State. While the Court invalidated as discriminatory an amendment to that law reducing the tax for in-state sales by nonresidents and placing a cap on the tax payable on transactions involving in-state sales, it also declared that the statute prior to the amendment "was neutral as to in-state and out-of-state sales." *Id.*, at 330. That is plainly not true if internal consistency is a requirement of neutrality: assuming that all States had New York's pre-1968 scheme, if sale and delivery both took place in New York, there would be a single tax, while if sale took place in New York and delivery in New Jersey, there would be double taxation.

as conflicting with decades of precedents upholding internally inconsistent state taxes, it seems to me that *Armco* rather than those numerous other precedents ought to be overruled.

Prior to *Armco,* the internal consistency test was applied only in cases involving apportionment of the net income of businesses that more than one State sought to tax. That was the issue in *Container Corp.,* see 463 U. S., at 169–171, the only case cited by *Armco* in support of an internal consistency rule, see 467 U. S., at 644–645, and there is no reason automatically to require internal consistency in other contexts. A business can of course earn net income in more than one State, but the total amount of income is a unitary figure. Hence, when more than one State has taxing jurisdiction over a multistate enterprise, an inconsistent apportionment scheme could result in taxation of more than 100% of that firm's net income. Where, however, tax is assessed not on unitary income but on discrete events such as sale, manufacture, and delivery, which can occur in a single State or in different States, that apportionment principle is not applicable; there is simply no unitary figure or event to apportion. That we have not traditionally applied the internal consistency test outside the apportionment context is amply demonstrated by the lengthy list of cases that the Court has (openly or tacitly) had to overrule here and in *Scheiner.*

It is possible to read *Armco* as requiring such a test in all contexts, but it is assuredly not necessary to do so. *Armco* dealt with West Virginia's 0.27% selling tax and 0.88% manufacturing tax, and its exemption from the selling tax for in-state but not out-of-state manufacturers. We discussed the internal consistency of that taxing scheme only after finding the selling tax discriminatory "[o]n its face," 467 U. S., at 642, because "[t]he tax provides that two companies selling tangible property at wholesale in West Virginia will be treated differently depending on whether the taxpayer conducts manufacturing in the State or out of it." *Ibid.* Combined with the finding that the selling tax imposed on

out-of-state producers could not be deemed to "compensate" for the higher manufacturing tax imposed only on West Virginia producer/sellers, *id.*, at 642–643, that was enough to invalidate the tax.   We went on to address the internal consistency rule in response to the State's argument that the taxpayer had not shown "actual discriminatory impact on it by pointing to a State that imposes a manufacturing tax that results in a total burden higher than that imposed on Armco's competitors in West Virginia." *Id.*, at 644.   After reciting the internal consistency principle applicable in apportionment cases, we said that "[a] similar rule applies where the allegation is that a tax on its face discriminates against interstate commerce," *ibid.*, regardless of "the shifting complexities of the tax codes of 49 other States . . . ." *Id.*, at 645.   The holding of *Armco* thus establishes only that a facially discriminatory taxing scheme that is not internally consistent will not be saved by the claim that in fact no adverse impact on interstate commerce has occurred.   To expand that brief discussion into a holding that internal consistency is always required, and thereby to revolutionize the law of state taxation, is remarkable.

Rather than use isolated language, written with no evident consideration of its potential significance if adopted as a general rule, to overturn a lengthy list of settled decisions, one would think that we would instead use the settled decisions to limit the scope of the isolated language.   As the cases from the past few Terms indicate, the internal consistency test invalidates a host of taxing methods long relied upon by the States and left unhampered by Congress.   We are already on shaky ground when we invoke the Commerce Clause as a self-operative check on state legislation, see Part II, *infra*, requiring us to develop rules unconstrained by the text of the Constitution.   Prudence counsels in favor of the least intrusive rule possible.

Applying more traditional tests, the Washington B & O tax is valid.   It is not facially discriminatory.   Unlike the

West Virginia tax in *Armco*, Washington's selling tax is imposed on all goods, whether produced in-state or out-of-state. No manufacturing tax is (or could be) imposed on out-of-state manufacturers, so no discrimination is present (or possible) there. All the State does is to relieve local producer/sellers from the burden of double taxation by declining to assess a manufacturing tax on local businesses with respect to goods on which a selling tax is paid. Nor does this arrangement, notwithstanding its nondiscriminatory appearance, have discriminatory effects in and of itself. An in-state manufacturer selling in-state pays one tax to Washington; an in-state manufacturer selling out-of-state pays one tax to Washington; and an out-of-state manufacturer selling in-state pays one tax to Washington. The State collects the same tax whether interstate or intrastate commerce is involved. The tax can be considered to have discriminatory effects only if one consults what other States are in fact doing (a case-by-case inquiry that appeals to no one, *ante*, at 247) or unless one adopts an assumption as to what other States are doing. It is the latter course that the internal consistency rule adopts, assuming for purposes of our Commerce Clause determination that other States have the same tax as the tax under scrutiny. As noted earlier, I see no basis for that assumption in the tradition of our cases; and I see little basis for it in logic as well. Specifically, I see no reason why the fact that other States, by adopting a *similar* tax, might cause Washington's tax to have a discriminatory effect on interstate commerce, is of any more significance than the fact that other States, by adopting a *dissimilar* tax, might produce such a result. The latter, of course, does not suffice to invalidate a tax. To take the simplest example: A tax on manufacturing (without a tax on wholesaling) will have a discriminatory effect upon interstate commerce if another State adopts a tax on wholesaling (without a tax on manufacturing)—for then a company manufacturing and selling in the former State would pay only a single tax, while a company

manufacturing in the former State but selling in the latter State would pay two taxes. When this very objection was raised in *Armco*, we replied that, unlike the situation in *Armco* itself, "such a result would not arise from impermissible discrimination against interstate commerce . . . ." 467 U. S., at 645. That response was possible there because the West Virginia tax was facially discriminatory; it is not possible here because the Washington B & O tax is not.

It seems to me that we should adhere to our long tradition of judging state taxes on their own terms, and that there is even less justification for striking them down on the basis of assumptions as to what other States *might* do than there is for striking them down on the basis of what other States *in fact* do. Washington's B & O tax is plainly lawful on its own. It may well be that other States will impose similar taxes that will increase the burden on businesses operating interstate—just as it may well be that they will impose *dis*similar taxes that have the same effect. That is why the Framers gave Congress the power to regulate interstate commerce. Evaluating each State's taxing scheme on its own gives this Court the power to eliminate evident discrimination, while at the same time leaving the States an appropriate degree of freedom to structure their revenue measures. Finer tuning than this is for the Congress.

## II

I think it particularly inappropriate to leap to a restrictive "internal consistency" rule, since the platform from which we launch that leap is such an unstable structure. It takes no more than our opinions this Term, and the number of prior decisions they explicitly or implicitly overrule, to demonstrate that the practical results we have educed from the so-called "negative" Commerce Clause form not a rock but a "quagmire," *Northwestern States Portland Cement Co.* v. *Minnesota*, 358 U. S. 450, 458 (1959). Nor is this a recent liquefaction. The fact is that in the 114 years since

the doctrine of the negative Commerce Clause was formally adopted as holding of this Court, see *Case of the State Freight Tax*, 15 Wall. 232 (1873), and in the 50 years prior to that in which it was alluded to in various dicta of the Court, see *Cooley* v. *Board of Wardens*, 12 How. 299, 319 (1852); *Gibbons* v. *Ogden*, 9 Wheat. 1, 209 (1824); *id.*, at 226–229, 235–239 (Johnson, J., concurring in judgment), our applications of the doctrine have, not to put too fine a point on the matter, made no sense. See generally D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789–1888, pp. 168–181, 222–236, 330–342, 403–416 (1985).[3]

That uncertainty in application has been attributable in no small part to the lack of any clear theoretical underpinning for judicial "enforcement" of the Commerce Clause. The text of the Clause states that "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, § 8, cl. 3. On its face, this is a charter for Congress, not the courts, to ensure "an area of trade free from interference by the States." *Boston Stock Exchange*, 429 U. S., at 328. The pre-emption of state legislation would automatically fol-

---

[3] Professor Currie's discussion of the Commerce Clause decisions of the Marshall and Taney Courts is summed up by his assessment of the leading Taney Court decision: "Taken by itself, *Cooley* [v. *Board of Wardens*, 12 How. 299 (1852),] may appear arbitrary, conclusory, and irreconcilable with the constitutional text. Nevertheless, anyone who has slogged through the Augean agglomeration preceding Curtis's labors must find them scarcely less impressive than those of the old stable-cleaner himself." D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789–1888, p. 234 (1985). He concludes his discussion of the Chase Court's Commerce Clause jurisprudence by noting: "In doctrinal terms the Court's efforts in this field can be described only as a disaster." *Id.*, at 342 (footnote omitted). And the Waite Court receives the following testimonial: "It is a relief that with the *Bowman* decision [*Bowman* v. *Chicago & Northwestern R. Co.*, 125 U. S. 465 (1888),] we have reached the end of the commerce clause decisions of the Waite period, for they do not make elevating reading." *Id.*, at 416 (footnote omitted). Future commentators are not likely to treat recent eras much more tenderly.

low, of course, if the grant of power to Congress to regulate interstate commerce were exclusive, as Charles Pinckney's draft constitution would have provided, see Abel, The Commerce Clause in the Constitutional Convention and in Contemporary Comment, 25 Minn. L. Rev. 432, 434 (1941), and as John Marshall at one point seemed to believe it was. See *Gibbons* v. *Ogden, supra,* at 209. However, unlike the District Clause, which empowers Congress "To exercise exclusive Legislation," Art. I, § 8, cl. 17, the language of the Commerce Clause gives no indication of exclusivity. See *License Cases,* 5 How. 504, 579 (1847) (opinion of Taney, C. J.). Nor can one assume generally that Congress' Article I powers are exclusive; many of them plainly coexist with concurrent authority in the States. See *Kewanee Oil Co.* v. *Bicron Corp.,* 416 U. S. 470, 479 (1974) (patent power); *Goldstein* v. *California,* 412 U. S. 546, 560 (1973) (copyright power); *Houston* v. *Moore,* 5 Wheat. 1, 25 (1820) (court-martial jurisdiction over the militia); *Sturges* v. *Crowninshield,* 4 Wheat. 122, 193–196 (1819) (bankruptcy power). Furthermore, there is no correlative denial of power over commerce to the States in Art. I, § 10, as there is, for example, with the power to coin money or make treaties. And both the States and Congress assumed from the date of ratification that at least some state laws regulating commerce were valid. See *License Cases, supra,* at 580–581. The exclusivity rationale is infinitely less attractive today than it was in 1847. Now that we know interstate commerce embraces such activities as growing wheat for home consumption, *Wickard* v. *Filburn,* 317 U. S. 111 (1942), and local loan sharking, *Perez* v. *United States,* 402 U. S. 146 (1971), it is more difficult to imagine what state activity would survive an exclusive Commerce Clause than to imagine what would be precluded.

Another approach to theoretical justification for judicial enforcement of the Commerce Clause is to assert, as did Justice Curtis in dicta in *Cooley* v. *Board of Wardens, supra,* at 319, that "[w]hatever subjects of this power are in their

nature national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress." That would perhaps be a wise rule to adopt (though it is hard to see why judges rather than legislators are fit to determine what areas of commerce "in their nature" require national regulation), but it has the misfortune of finding no conceivable basis in the text of the Commerce Clause, which treats "Commerce . . . among the several States" as a unitary subject. And attempting to limit the Clause's pre-emptive effect to state laws *intended* to regulate commerce (as opposed to those intended, for example, to promote health), see *Gibbons* v. *Ogden, supra,* at 203, while perhaps a textually possible construction of the phrase "regulate Commerce," is a most unlikely one. Distinguishing between laws with the *purpose* of regulating commerce and "police power" statutes with that *effect* is, as Taney demonstrated in the *License Cases, supra,* at 582–583, more interesting as a metaphysical exercise than useful as a practical technique for marking out the powers of separate sovereigns.

The least plausible theoretical justification of all is the idea that in enforcing the negative Commerce Clause the Court is not applying a constitutional command at all, but is merely interpreting the will of Congress, whose silence in certain fields of interstate commerce (but not in others) is to be taken as a prohibition of regulation. There is no conceivable reason why congressional inaction under the Commerce Clause should be deemed to have the same pre-emptive effect elsewhere accorded only to congressional action. There, as elsewhere, "Congress' silence is just that—silence . . . ." *Alaska Airlines, Inc.* v. *Brock,* 480 U. S. 678, 686 (1987). See Currie, *supra* n. 3, at 334 (noting "the recurring fallacy that in some undefined cases congressional inaction was to be treated as if it were permissive or prohibitory legislation—though

the Constitution makes clear that Congress can act only by affirmative vote of both Houses" (footnotes omitted).[4]

The historical record provides no grounds for reading the Commerce Clause to be other than what it says—an authorization for Congress to regulate commerce. The strongest evidence in favor of a negative Commerce Clause—that version of it which renders federal authority over interstate commerce exclusive—is Madison's comment during the Convention: "Whether the States are now restrained from laying tonnage duties depends on the extent of the power 'to regulate commerce.' These terms are vague but seem to exclude this power of the States." 2 M. Farrand, Records of the Federal Convention of 1787, p. 625 (1937). This comment, however, came during discussion of what became Art. I, § 10, cl. 3: "No State shall, without the Consent of Congress, lay any Duty of Tonnage . . . ." The fact that it is difficult to conceive how the power to regulate commerce would *not* include the power to impose duties; and the fact that, despite this apparent coverage, the Convention went on to adopt a provision prohibiting States from levying duties on tonnage without congressional approval; suggest that Madison's as-

---

[4] Unfortunately, this "legislation by inaction" theory of the negative Commerce Clause seems to be the only basis for the doctrine, relied upon by the Court in *Scheiner, post*, at 289, n. 23, that Congress can authorize States to enact legislation that would otherwise violate the negative Commerce Clause. See *Prudential Ins. Co.* v. *Benjamin*, 328 U. S. 408 (1946). Nothing else could explain the *Benjamin* principle that what was invalid state action can be rendered valid state action through "congressional consent." There is surely no area in which Congress can permit the States to violate the Constitution. Thus, in *Cooley* v. *Board of Wardens*, 12 How. 299 (1852), Justice Curtis, to whom there had not occurred the theory of congressional legislation by inaction, wrote of the relationship between States and the negative Commerce Clause as follows: "If the States were divested of the power to legislate on this subject by the grant of the commercial power to Congress, it is plain this Act could not confer upon them power thus to legislate. If the Constitution excluded the States from making any law regulating commerce, certainly Congress cannot regrant, or in any manner reconvey to the States that power." *Id.*, at 318.

sumption of exclusivity of the federal commerce power was ill considered and not generally shared.

Against this mere shadow of historical support there is the overwhelming reality that the Commerce Clause, in its broad outlines, was not a major subject of controversy, neither during the constitutional debates nor in the ratifying conventions. Instead, there was "nearly universal agreement that the federal government should be given the power of regulating commerce," Abel, 25 Minn. L. Rev., at 443–444, in much the form provided. "The records disclose no constructive criticisms by the states of the commerce clause as proposed to them." F. Frankfurter, The Commerce Clause under Marshall, Taney and Waite 12 (1937). In The Federalist, Madison and Hamilton wrote numerous discourses on the virtues of free trade and the need for uniformity and national control of commercial regulation, see The Federalist No. 7, pp. 62–63 (C. Rossiter ed. 1961); *id.*, No. 11, pp. 89–90; *id.*, No. 22, pp. 143–145; *id.*, No. 42, pp. 267–269; *id.*, No. 53, p. 333, but said little of substance specifically about the Commerce Clause—and that little was addressed primarily to foreign and Indian trade. See generally Abel, *supra,* at 470–474. Madison does not seem to have exaggerated when he described the Commerce Clause as an addition to the powers of the National Government "which few oppose and from which no apprehensions are entertained." The Federalist No. 45, p. 293. I think it beyond question that many "apprehensions" would have been "entertained" if supporters of the Constitution had hinted that the Commerce Clause, despite its language, gave this Court the power it has since assumed. As Justice Frankfurter pungently put it: "the doctrine that state authority must be subject to such limitations as the Court finds it necessary to apply for the protection of the national community . . . [is] an audacious doctrine, which, one may be sure, would hardly have been publicly avowed in support of the adoption of the Constitution." Frankfurter, *supra,* at 19.

In sum, to the extent that we have gone beyond guarding against rank discrimination against citizens of other States — which is regulated not by the Commerce Clause but by the Privileges and Immunities Clause, U. S. Const., Art. IV, § 2, cl. 1 ("The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States")—the Court for over a century has engaged in an enterprise that it has been unable to justify by textual support or even coherent nontextual theory, that it was almost certainly not intended to undertake, and that it has not undertaken very well. It is astonishing that we should be expanding our beachhead in this impoverished territory, rather than being satisfied with what we have already acquired by a sort of intellectual adverse possession.