SAUDI REFINING, INC., Petitioner,

v.

DIRECTOR OF REVENUE, Respondent.

C.A. No. 97C–01–092 SCD.

Superior Court of Delaware,
New Castle County.

Submitted: Oct. 29, 1997.
Decided: Jan. 21, 1998.

Leonard S. Togman, Jennifer Gimler Brady, of Potter Anderson & Corroon, Wilmington, for Petitioner Saudi Refining, Inc.

Jos. Patrick Hurley, Jr., Deputy Attorney General, Wilmington, for Respondent Delaware Division of Revenue.

## OPINION

DEL PESCO, Judge.

### Introduction

The parties have petitioned the Court to determine whether Delaware's Wholesaler Gross Receipts Tax[1] is unconstitutional as applied by the Delaware Director of Revenue ("Director") to Saudi Refining, Inc. ("SRI") for the assessed years of 1989 through 1995.[2] In particular, SRI argues that the gross receipts tax violates both the Import–Export Clause and the Commerce Clause of the

---

**1.** 30 *Del. C.* § 2901 *et seq.* The Delaware Wholesaler Gross Receipts Tax has been held constitutional. *Franklin–Fibre Lamitex Corp. v. Director of Revenue,* Del.Super., 505 A.2d 1296, 1300–01 (1985) (upholding constitutionality of gross receipts tax on all goods "sold within the state"), *aff'd,* Del.Supr., 511 A.2d 385 (1986).

**2.** SRI has also filed a protest with the Division of Revenue for its 1996 assessment of gross receipts tax. The parties have stipulated that the resolution of the 1996 protest will be held in abeyance, as they have agreed to be bound by the final determination in the instant matter.

United States Constitution. With respect to the Import–Export Clause, the principal issue revolves around whether Delaware's gross receipts tax is an impermissible duty or impost on imported goods as enunciated by the United States Supreme Court in *Michelin Tire Corp. v. Wages.*[3] With respect to the Commerce Clause, the parties' dispute centers on whether the tax satisfies the requirements announced by the Supreme Court in *Japan Line, Ltd. v. County of Los Angeles,*[4] which includes the four-prong test established by *Complete Auto Transit, Inc. v. Brady.*[5] Of particular importance in this regard is whether a sufficient nexus existed between SRI's business activities and the State of Delaware that would bring SRI within the purview of the gross receipts tax.[6]

■ The Court finds that the gross receipts tax does not violate the Import–Export Clause because it is a nondiscriminatory tax that is not directed at imported goods still in transit. Because the Court finds that there is a sufficient nexus between SRI's business activities and the State, that the gross receipts tax is fairly apportioned, nondiscriminatory, and related to services provided by the State, and that the tax does not create the risk of international multiple taxation nor impair the federal government's ability to speak with one voice in the regulation of foreign commerce, Delaware's gross receipts tax does not violate the Commerce Clause. In light of these findings, the Court need not address the Director's argument that SRI's claims for refunds for the years 1989 through 1991 are barred by the statute of limitations .[7]

## Procedural Background

On March 28, 1991, pursuant to 30 *Del. C.* § 2902, the Division of Revenue assessed SRI taxes and interest due for wholesaler gross receipts on crude oil it sold and delivered to Star Enterprise's refinery in Delaware City. SRI disputed the assessment but agreed to pay the tax and interest on or about May 2, 1991 in exchange for the Division's waiver of penalty. In December 1995, SRI filed claims with the Division for full refunds of the taxes paid in the years 1989 through 1995. In May of 1996, the Division issued a notice of disallowance. SRI filed a protest with the Division that was later denied. SRI then appealed the disallowance to the Delaware Tax Appeal Board. That appeal was removed to Superior Court for the present proceedings. The parties have stipulated to all material facts relating to the issues in dispute, agree that summary judgment is appropriate, and have filed cross-motions for summary judgment.

## Factual Background

SRI, a Delaware corporation, is a wholly owned subsidiary of another Delaware corporation, Aramco Services Company ("ASC"). ASC is, in turn, wholly owned by the Saudi Arabian Oil Company ("Saudi Aramco"), a business enterprise of the Saudi Arabian government. SRI's principal place of business is in Houston, Texas. SRI has no offices or employees located in Delaware. SRI is in the business of buying and selling crude oil that it purchases from Saudi Aramco. SRI is also a 50% partner, along with Texaco Refining and Marketing East, Inc. ("TRMI–East"), a Delaware corporation, in Star Enterprises ("Star"), a partnership formed under the laws of New York in December 1988. TRMI–East is a wholly owned subsidiary of Texaco Refining and Marketing, Inc. ("TRMI"), a Delaware corporation. SRI participates in the management of the busi-

**3.** 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976).

**4.** 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979).

**5.** 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

**6.** *Id.; see also Quill v. North Dakota,* 504 U.S. 298, 312–15, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992).

**7.** The Director has argued that because SRI filed its claim for a refund of paid taxes on December 22, 1995, the 3–year statute of limitations had run for any claims for the years 1989, 1990, and 1991. *See* 30 *Del. C.* §§ 530, 537, 539, and 2108 [§ 2108 was repealed effective Jan. 1, 1992, and replaced by §§ 537, 539].

ness of the partnership with TRMI–East by appointing three representatives to a six-member management committee that is charged with the overall management and control of the business affairs of Star.

Star is in the business of refining crude oil and in wholesaling and retailing petroleum products. Star owns three refineries, one of which is located in Delaware City. Pursuant to "Crude Oil Contract # 1" between Star, SRI and TRMI, SRI and TRMI are each required to sell and supply Star with the lesser of 50% of the crude oil to be refined at Star refineries or 300,000 barrels of crude oil per calendar day (300,000 MBPCD). On those occasions when Star requires less than 600,000 MBPCD, SRI ends up supplying less oil to Star than TRMI. Contract # 1 provides that custody, transfer, risk of loss, and title to the crude oil sold by SRI passes to Star at the first flange at the Star refineries. The flange is the outer edge of the intake pipes at the refineries.

Under "Crude Oil Contract # 3," SRI is required to sell TRMI 300,000 MBPCD of crude oil which TRMI then resells to Star under another contract known as "Crude Oil Contract # 2." Between January 1989 and May 1993, title to the crude oil sold by SRI to TRMI passed at the first flange at Star's Delaware City refinery.[8] In June 1993, Crude Oil Contract # 3 was amended to provide that title to the oil sold by SRI to TRMI passes on the high seas before the transporting vessel enters the 200–mile exclusive economic interest zone of the United States.

On average, SRI and TRMI provide the Delaware City refinery with 65,000 MBPCD of crude oil. SRI makes no sales in Delaware other than its sales of crude oil to Star. Under the terms of Crude Oil Contracts # 1 and # 3, SRI has the right and obligation to transfer and deliver (including "lightering") all crude oil that it sells to Star and to TRMI. Lightering is the process by which oil is pumped from a tanker into smaller barges to lighten the tanker's load and thereby decrease its draft so that the ship can eventually move through a shallow channel. Under

Crude Oil Contract # 3, TRMI irrevocably appointed SRI as its agent, or attorney in fact, for exercising its rights and obligations under Crude Oil Contract # 2, which relates to TRMI's resale of oil to Star.

SRI discharges its duty to transport and deliver the oil it sells directly to Star as well as the oil TRMI resells to Star by authorizing Saudi Petroleum International, Inc. ("SPII"), an affiliated Delaware corporation, with offices in New York, to act as SRI's agent for purpose of chartering vessels to transport the oil. SPII arranges for delivery of oil to the Delaware City refinery through the use of independent common carriers. Deliveries on behalf of SRI or TRMI occur on average about three times a month.

Actual delivery of the oil to Delaware City is accomplished in the following manner. Oil tankers carrying between 400,000 and 900,000 barrels of oil are chartered for SRI by SPII. The tankers are owned by independent common carriers. When a tanker enters Delaware Bay, the ship is boarded by a pilot from the Pilot's Association for Bay and River Delaware, whose main office is located in Philadelphia. The pilot serves as an aid to the ship's captain to ensure the vessel's safe passage up the river to its destination. Because a fully loaded tanker draws too much water to land directly at the Delaware City refinery, the pilot guides the tanker to a deep-water site in Delaware Bay off shore from Milford, Delaware. The tankers anchor and proceed to lighter much of their cargo upon rendezvous with transfer barges in order to enable the tanker eventually to proceed to Star's dock at Delaware City. The lightering process takes about thirty-six to forty hours depending upon the size of the tanker and the number of barges available. Once loaded, the barges proceed to Delaware City where the oil is pumped into storage tanks. SPII contracts with a Pennsylvania firm for the lightering operations required by SRI.

After the oil is lightered, the tanker proceeds on an incoming tide up the channel to Delaware City where it docks at Star's refin-

---

8. In 1991, there were four deliveries in which title actually passed on the high seas outside Delaware's territorial waters for which gross re-

ceipts taxes were assessed but later refunded by the Division to SRI.

ery and off-loads the remaining oil. Travel up river from the deep-water anchorage takes about six hours. It takes another 28 hours to off-load the balance of the oil from the lightered tanker. The deep-water anchorage and the channel used by the tankers to land at Star's refinery are within Delaware's territorial waters.

### Delaware's Wholesaler Gross Receipts Tax

Under the provisions of Delaware's Wholesaler Gross Receipts Tax, wholesalers are required to obtain an annual business license at a cost of $75.00.[9] A wholesaler is "every person engaged, as owner or agent, in the business of selling or exchanging with another person goods for cash or barter or any consideration for the purpose of resale by the person acquiring the goods sold or exchanged ...."[10] Under the statute, wholesalers were additionally assessed "a license fee" on the "aggregate gross receipts attributable to sales of tangible personal property physically delivered in this State."[11] During the years 1989 through 1995, the State levied an additional tax on gross receipts derived from the sale of petroleum products.[12] Crude oil, as sold by SRI to Star and TRMI, is defined as a petroleum product.[13] A surtax was also imposed on fees calculated under the statute.[14]

For the years 1989 through 1995, SRI sold a total of 172.1 million barrels of oil to TRMI and Star for delivery to Star's Delaware City refinery. This oil was valued at approximately $3.019 billion. On these sales, SRI paid gross receipts taxes in the amount of $17,366,126.00.

SRI did not incur other taxes on its crude oil sales destined for Delaware City. During the period 1989 through 1993, however, Star paid federal oil spill taxes on the oil it purchased from SRI and TRMI. Pursuant to the apportionment formula required by Delaware corporate income taxes,[15] and pursuant to the instructions of the Delaware Corporation Income Tax Return, SRI reported that it owned real and tangible property in Delaware, paid certain wages to Delaware employees and had gross receipts from sales made in Delaware. Such property, wages and gross receipts represented SRI's proportionate ownership as a general partner in Star's Delaware City refinery. Except for its proportionate interest in Star's Delaware City refinery, SRI has no other property, wages, or gross receipts in Delaware.

### The Import–Export Clause

Article 1, section 10, clause 2 of the United States Constitution states in relevant part:

> No State shall, without the Consent of Congress, lay any Impost or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection laws.

Until the United States Supreme Court's ruling in *Michelin Tire Corp. v. Wages*,[16] courts determined whether imported goods were properly subject to state taxation by applying the "original package test."[17] Under this doctrine, if the goods were still the property of the importer and remained in the package or form in which they were imported, they were shielded by the Constitution's prohibition against state taxation.[18] The test for exports was whether the goods had sufficiently entered the stream of export commerce on their final and continuous journey out of the country.[19]

9.   30 *Del. C.* § 2902(b).

10.   30 *Del. C.* § 2901(7)a.1.

11.   30 *Del. C.* § 2902(c)(1).

12.   30 *Del. C.* § 2902(c)(3).

13.   30 *Del. C.* § 2901(8).

14.   30 *Del. C.* § 2902(c)(5).

15.   30 *Del. C.* § 1903(b)(6).

16.   423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976).

17.   *Id.* at 282–83, 96 S.Ct. 535.

18.   *Id.*

19.   *See Kosydar v. National Cash Register Co.*, 417 U.S. 62, 68, 94 S.Ct. 2108, 40 L.Ed.2d 660 (1974); *Richfield Oil Corp. v. State Bd. of Equalization*, 329 U.S. 69, 82–83, 67 S.Ct. 156, 91 L.Ed. 80 (1946).

The Supreme Court abandoned the original package test and over one hundred years of precedent in *Michelin Tire* when it shifted the focus of its Import–Export Clause analysis from the character of the imported goods in themselves to an examination of the nature and purpose of the tax imposed on the goods. The Court articulated this view by identifying three principal concerns: (1) the federal government must speak with one voice when regulating commercial relations with foreign governments; (2) import revenues were to be a major source of revenue for the federal government and should not be diverted to the states; and (3) states with ports of entry were to be restricted from taxing citizens of the other states by taxing goods merely flowing through ports to inland states.[20] The *Michelin Tire* Court noted that nothing in the history of the Import–Export Clause even remotely suggested that a nondiscriminatory ad valorem tax, such as assessed by the State of Georgia and which happened to be imposed on imported goods that were no longer in import transit, was objectionable to the framers of the Constitution. Unlike a discriminatory state tax on goods as imports, such a tax would not be regarded as an impediment that severely hampered commerce or constituted a form of tribute exacted against inland states. A nondiscriminatory tax also could have no impact whatever on the federal government's exclusive regulation of foreign commerce.[21] The Court observed:

> By definition, a nondiscriminatory tax does not fall on imports as such because of their place of origin. It cannot be used to create special protective tariffs or particular preferences for certain domestic goods, and it cannot be applied selectively to encourage or discourage any importation in any manner inconsistent with federal regulation.

> Nor will such taxation deprive the Federal Government of the exclusive right to all revenues from imposts or duties on imports and exports, since that right by definition only extends to revenues from extractions of a particular category; if nondiscriminatory ad valorem taxation is not in that category, it deprives the Federal Government of nothing to which it is entitled. Unlike imposts and duties, which are essentially taxes on the commercial privilege of bringing goods into the country, such property taxes are taxes by which a State apportions the cost of such services as police and fire protection among the beneficiaries according to their respective wealth; there is no reason why an importer should not bear his share of these costs along with his competitors handling only domestic goods. The Import–Export Clause clearly prohibits state taxation based on the foreign origin of the imported goods, but it cannot be read to accord foreign goods preferential treatment that permits escape from uniform taxes imposed without regard to foreign origin for services which the state supplies.[22]

In a subsequent case, *Department of Revenue v. Association of Washington Stevedoring Cos.*,[23] the Supreme Court further elaborated on the principles announced in *Michelin Tire*. The Court held that a Washington State tax on stevedoring services that handled imported goods still in transit through the state as imports did not violate the Import–Export Clause because the tax was applied to all businesses and services in the state whether they concerned imported goods or exclusively domestic items.[24] The tax merely compensated the State of Washington for services and protection extended to stevedoring as well as other businesses in the state.[25] Finally, as a tax that fell upon a taxpayer with a reasonable nexus to the state, that was properly apportioned, nondiscriminatory and reasonably related to services provided by the state, it met all the criteria of *Michelin*

---

20. *Michelin Tire,* 423 U.S. at 286, 96 S.Ct. 535.

21. *Id.*

22. *Id.* at 286–87, 96 S.Ct. 535 (citations omitted).

23. 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978).

24. *Id.* at 754–55, 98 S.Ct. 1388.

25. *Id.*

*Tire.*[26] The fact that the goods handled by the stevedores may still have been in transit as imports was distinguished by the Court when it noted that the Washington tax was imposed on the stevedoring services provided and not on the goods themselves as imports or exports.[27]

In the instant case, Delaware's Wholesaler Gross Receipts Tax does not offend the principles articulated in *Michelin Tire* and *Washington Stevedoring.* The tax is imposed on all persons engaged in selling goods that are directly consumed or used by the purchaser in the conduct of any business activity in Delaware without regard to whether the goods originated inside or outside the State.[28] The tax is based upon "the aggregate gross receipts attributable to sales of tangible personal property physically delivered within this State."[29] Nowhere in the language of the statute is there mention of imported goods or goods of a foreign origin.

Applying the *Michelin Tire* criteria to the gross receipts tax, the Court finds that there is nothing about the tax that prevents or impedes the federal government from speaking with one voice on the regulation of foreign commerce. The gross receipts tax is specifically limited to all transactions conducted by wholesalers within Delaware's borders. It falls just as readily upon crude oil sold and delivered by a wholesaler by way of domestic pipelines, barges, tank trucks or Delaware-based oil fields, if such exist. Nor does the gross receipts tax deprive the federal government of the exclusive right to revenues derived from imports because it is imposed for the commercial privilege of bringing the goods into the United States. Rather, the tax is imposed in a nondiscriminatory manner on all sales and physical deliveries of goods in the State. The tax is reasonably apportioned to the value of the goods without regard to origin and is reasonably related to costs for services and protec-

tions provided by the state. To not apply the tax on specifically identified goods of foreign origin would have the negative effect of according "imported goods preferential treatment that permits escape from uniform taxes imposed without regard to foreign origin for services which the state supplied."[30] Finally, with respect to whether the goods are still in transit as imports, the Court notes that the crude oil sold and delivered by SRI to the Star's Delaware refinery is entirely consumed and used at the plant. The oil is not flowing to an interstate destination. Thus, there is no basis to conclude that the Delaware tax offends the Import–Export Clause's purpose of avoiding disharmony among the states by prohibiting the imposition of a transit tax on imported goods merely passing through the State.

### The Commerce Clause

■ Article 1, section 8, clause 3 of the United States Constitution states in relevant part:

Congress shall have the power ... "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

■ In *Japan Line, Ltd. v. County of Los Angeles,*[31] the United States Supreme Court articulated the criteria for determining whether a tax upon international commercial activity violates the Commerce Clause. The Court held that the tax must first meet the four-prong test it set forth in *Complete Auto Transit, Inc. v. Brady,*[32] which provides that a tax is not unconstitutional *per se* if it: (1) is applied to an activity with a substantial nexus to the taxing state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to services provided by the state.[33] *Japan Line* imposes two further requirements: first, that the tax must not create the risk of

26. *Id.* at 755, 98 S.Ct. 1388.

27. *Id.* at 755, 98 S.Ct. 1388.

28. *See* 30 *Del. C.* § 2901(7)a. 1.

29. 30 *Del. C.* § 2902(c)(1).

30. *Michelin Tire,* 423 U.S. at 287, 96 S.Ct. 535.

31. 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979).

32. 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

33. *Id.* at 279, 97 S.Ct. 1076.

international multiple taxation; and second, that it must not impair the federal government's ability to "speak with one voice" in the regulation of foreign commerce.[34]

### 1. Nexus

■ In *Oklahoma Tax Commission v. Jefferson Lines, Inc.*,[35] the Supreme Court stated:

> It has long been settled that a sale of tangible goods has a sufficient nexus to the State in which the sale is consummated to be treated as a local transaction taxable by that State. So, too, in addressing the interstate provision of services, we recently held that a State in which an interstate telephone call originates or terminates has the requisite Commerce Clause nexus to tax a customer's purchase of that call as long as the call is billed or charged to a service address, or paid by an addressee, within the taxing State.[36]

SRI's sale and delivery of crude oil to Star clearly falls within the parameters of tangible goods as noted in *Jefferson Lines*. In another recent case, *Koch Fuels, Inc. v. Clark*,[37] the Rhode Island Supreme Court held that a substantial nexus as required by *Complete Auto* existed between a seller of fuel oil and an in-state purchaser for the state to assess a 1% gross earnings tax on the sale of the fuel oil.[38] The facts of *Koch Fuels* are remarkably similar to the instant case. Koch Fuels, Inc. sold oil to a Rhode Island power company. The fuel oil originated from out-of-state sources and was shipped via common independent carriers using barges or vessels. Title, possession, and risk of loss relating to the oil shipments passed from Koch to the power company at the company's flange. The quantity of fuel oil delivered over the three-year period in question amounted to over 26 million gallons. Koch had no employees in Rhode Island and at no relevant time did it own or rent property in the State. The sale of oil was Koch's only contact with Rhode Island. The Rhode Island Supreme Court held:

> On the basis of Koch's complete control over the oil shipments, the exclusive nature of the common carrier's contract, the unique nature of the cargo, and the fact that the sales were consummated upon delivery in Rhode Island, we are of the opinion that Koch's activities created in practical effect a physical presence within this state. Given Koch's physical presence in Rhode Island, we agree with the District Court's conclusion that Koch had sufficient contact with the state to satisfy the substantial nexus requirement of the *Complete Auto* test.[39]

Comparatively speaking, SRI has a significantly greater presence in Delaware than Koch did in Rhode Island. Not only are the quantities of oil delivered far more substantial (172 million barrels[40] delivered to Star's Delaware City refinery) but the interrelationships between SRI, Star, SPII, and TRMI–East disclose a complex web of corporate and business dealings with Delaware as the common denominator. SRI, SPII, TRMI–East, and TRMI are Delaware corporations. SRI owns an unpartitioned, half interest in Star. SRI participates directly in the management of Star by appointing three members of a six-member management committee that oversees the operations of Star. Star is, in turn, under long-term contract to purchase most of its oil from SRI and TRMI, the parent company of TRMI–East. TRMI buys its oil from SRI. With regard to its sale of

---

**34.** *Japan Line*, 441 U.S. at 451, 99 S.Ct. 1813.

**35.** 514 U.S. 175, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995).

**36.** *Id.* at 1337–38, 514 U.S. 175 (citations omitted); *see Goldberg v. Sweet*, 488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989) (tax on telephone calls); *McGoldrick v. Berwind–White Coal Mining Co.*, 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565 (1940) (tax on sale of coal shipped into taxing state by seller).

**37.** R.I.Supr., 676 A.2d 330, *cert. denied*, —— U.S. ——, 117 S.Ct. 301, 136 L.Ed.2d 219 (1996).

**38.** *Id.* at 333–34.

**39.** *Id.* at 334.

**40.** There are 42 U.S. gallons of petroleum per barrel.

crude oil to Star, SRI is, in part, selling oil to itself.[41]

The tri-monthly oil shipments that SRI delivers to Star spend anywhere from four to five days in Delaware's territorial waters before they pass into Star's possession. Oil tankers anchor and off-load their cargos under the direct control and direction of SRI through its subsidiary SPII and SPII's agents and contractees. The delivery of oil, moreover, is a hazardous operation, not only because of the risks associated with oil spills, but also from fire, explosion, and the potential for collision with other ships. Because any of these potentialities may occur in Delaware's territory, the State naturally takes a concerned view.

SRI argues that the Supreme Court's ruling in *Quill Corp. v. North Dakota*[42] should apply to its sale of oil to Star and TRMI. In *Quill*, the Court applied the "bright-line test" that a vendor, whose only contact with the taxing state was the sale of mail-order goods through the U.S. mail or by common carrier, lacked the "substantial nexus" required under *Complete Auto*.[43]

The facts and circumstances of *Quill*, however, are clearly distinguishable from the instant case. SRI is not a mail-order business with no other contacts with Delaware. The sheer magnitude of the goods purchased, the length of time necessary to consummate the sales transaction while the goods are in Delaware territory, and the complex arrangements for delivery and passage of title indicate a relationship with Delaware of a wholly different order than contemplated in *Quill.* For the above reasons, the Court finds that SRI has a substantial nexus with the State as required under the *Complete Auto* test.

### 2. Fair Apportionment

Delaware seeks to tax only sales that are consummated by physical delivery within the state.[44] This comports with the requirement that a state tax "only that portion of the revenues from interstate activity which reasonably reflects the in-state component of the activity being taxed."[45]

### 3. Interstate Discrimination

■ As previously discussed, the gross receipts tax is a nondiscriminatory tax that applies to gross sales of goods within the State and that does not unduly fall upon imported goods as imports. The tax does not discriminate on goods merely passing through the state because goods taxed under the statute must be physically delivered "for the purpose of resale by the person acquiring the goods ... and includes ... materials which are to be directly consumed or used by the purchaser in the conduct of any business or activity."[46] Because the oil sold by SRI is not in transit through the state, but consumed and used by Star, there is no burden upon interstate commerce.

### 4. State Services

■ Under *Complete Auto*, the tax must be fairly related to the services provided by

---

41. SRI argues that its 50% ownership of Star is intangible partnership property and therefore cannot be relied upon to establish SRI's presence in Delaware. SRI cites *Director of Revenue v. DiSabatino*, Del.Super., C.A. No. 87A–FE–11, 1989 WL 112049, Babiarz, J. (Sept. 8, 1988), for the proposition that the conveyance of an intangible partnership interest did not subject out-of-state partners to a tax on gains of real property owned by the partnership. SRI concludes that the existence of its intangible partnership interest in Star does not qualify it as sufficiently present in the state for taxation of its sale and delivery of oil delivered to Star. *DiSabatino* is clearly distinguishable. The *DiSabatino* participants were primarily limited partners with no managerial say in the affairs of the partnership's business, and the partnership itself was not used to carry on business in Delaware. *Id.* at *2. In the instant case, SRI maintains a direct managerial presence in the business affairs of Star as a general partner, and SRI's partnership with TRMI–East is clearly intended for the purpose of carrying on business in Delaware and other states.

42. 504 U.S. 298, 504 U.S. 298, 119 L.Ed.2d 91 (1992).

43. *Id.* at 301, 315, 97 S.Ct. 1076 (quoting *National Bellas Hess, Inc. v. Department of Revenue of Illinois*, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967)).

44. 30 *Del. C.* § 2902(c)(1).

45. *Goldberg v. Sweet*, 488 U.S. 252, 262, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989).

46. 30 *Del. C.* § 2901(7)a. 1.

the state.[47] This requirement serves to "limit the reach of State taxing authority so as to ensure that State taxation does not unduly burden interstate commerce."[48] There is an "additional limitation that the *measure* of the tax must be reasonably related to the extent of the contact, since it is the activities or presence of the taxpayer in the State that may properly be made to bear a just share of State tax burden."[49] Further, "[t]he tax which may be imposed on a particular interstate transaction need not be limited to the cost of the services incurred by the State on account of that particular activity.... On the contrary, interstate commerce may be required to contribute to the cost of providing *all* governmental services, including those services from which it arguably received no direct 'benefit.'"[50]

In the instant case, the Director of Revenue has submitted affidavits from relevant State agencies that indicate the State's direct involvement in various activities or potential actions that concern the environmental safety of Delaware waters and shorelands. Although these affidavits focus upon oil spills, other hazards and concerns, as previously discussed, would also reasonably implicate State services such as fire protection and other services from which SRI may not yet have benefitted. Given the frequency of SRI's delivery of oil to the Delaware City refinery and the length of time the oil remains in Delaware waters, the Court finds that the gross receipts tax assessed on SRI is fairly related to the services received.

### 5. International Multiple Taxation

Neither party asserts that there is "a risk of international multiple taxation" of the instrumentalities of foreign commerce as identified in *Japan Line*.[51] The requirement that

the tax be free of such a risk is thus deemed fulfilled.

### 6. The Ability of the Federal Government to Speak with One Voice Regarding Foreign Commerce

■ The final proviso of *Japan Line* requires that the tax not "prevent the Federal Government from speaking with one voice when regulating commercial relations with foreign governments."[52] As previously discussed with regard to the *Michelin Tire* standard, the gross receipts tax concerns only tangible property sold and physically delivered within the State. Accordingly, nothing in the language of the statute would prevent or impede the federal government from speaking with one voice regarding the nation's dealings with foreign governments.

The fact that the federal government levied an oil spill tax on oil received at refineries[53] during some of the years in question has no bearing on this discussion since there is no suggestion that foreign commerce was differently affected than domestic commerce. The federal tax was limited to the creation of a trust fund to pay for liabilities and costs related to oil pollution.[54] It applied to all crude oil received by a refinery, and petroleum products entered into the United States for consumption, use or warehousing.[55] The federal statute specifically permits any state "to establish, or to continue in effect, a fund any purpose of which is to pay for costs or damages arising out of, or directly resulting from, oil pollution or the substantial threat of oil pollution."[56] Clearly, the federal government did not seek to preempt this field of taxation. There is nothing in the federal tax provisions or the corresponding environmental statutes which suggests that a nondiscriminatory gross receipts tax on oil, or any product, would impede federal efforts to ad-

**47.** *Complete Auto*, 430 U.S. at 279, 97 S.Ct. 1076.

**48.** *Quill*, 504 U.S. at 313, 504 U.S. 298.

**49.** *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 626, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981) (emphasis in original) (citations omitted).

**50.** *Goldberg*, 488 U.S. at 267, 109 S.Ct. 582 (emphasis in original) (citations omitted).

**51.** *Japan Line*, 441 U.S. at 451, 99 S.Ct. 1813.

**52.** *Id.*

**53.** 26 U.S.C. § 9509 (Oil Spill Liability Trust Fund).

**54.** 26 U.S.C. § 9509(c).

**55.** 26 U.S.C. § 4611(a).

**56.** 33 U.S.C. § 2718(b)(1).

dress the problems of oil pollution. Delaware's gross receipts tax, moreover, is not earmarked for strictly environmental purposes. It is a general revenue intended to support state services and operations generally, which would include many services unrelated to oil spill clean-ups. That Star paid federal oil spill taxes for some of the years in question in no way implicates the viability of the Delaware's gross receipts tax as applied to SRI.

## Conclusion

For the reasons discussed above, the Court finds that the Delaware Wholesaler Gross Receipts Tax as applied to SRI's sale of crude oil is not violative of either the Import–Export Clause or the Commerce Clause. The Director's motion for summary judgment is GRANTED. SRI's motion for summary judgment is DENIED.