FORD MOTOR COMPANY, Petitioner Below–Appellant,

v.

DIRECTOR OF REVENUE, Respondent Below– Appellee.

No. 257, 2008.

Supreme Court of Delaware.

Submitted: Sept. 17, 2008.
Decided: Dec. 8, 2008.
Reargument Denied Jan. 13, 2009.

Gordon W. Stewart, Esquire and Keith R. Sattesahn, Esquire of The Stewart Law Firm, Wilmington, DE; Of Counsel: Paul H. Frankel, Esquire (argued) and Irwin M. Slomka, Esquire of Morrison & Foerster, LLP of New York City, for appellant.

John S. McDaniel, Esquire (argued) of the Department of Justice, Wilmington, DE, for appellee.

Before BERGER, JACOBS, and RIDGELY, Justices.

RIDGELY, Justice:

Petitioner–Appellant Ford Motor Company ("Ford") appeals the judgment of the Superior Court affirming the determination by the Respondent–Appellee Director of Revenue (the "Director") that the Director may lawfully impose an unapportioned tax on Ford's receipts from sales of motor vehicles sold to independent dealerships located in Delaware.

Ford makes four arguments on appeal. First, it contends that the Superior Court erred in holding that the Wholesalers' Gross Receipts Tax (the "Wholesalers' Tax") did not violate the Commerce Clause of the United States Constitution as applied to Ford's unapportioned gross receipts. Second, Ford contends that under the Superior Court's prior decision in *Dial Corp. v. Director of Revenue*,[1] the location of where title and ownership of the goods are transferred determines whether the Wholesalers' Tax is fairly apportioned with respect to receipts from those goods. Third, it contends that the Superior Court erred in holding that the wholesalers' tax law permits the taxation of receipts from sales of vehicles "physically delivered" outside Delaware. Fourth, it contends that it is entitled to pre-judgment interest on any

refund of the Wholesalers' Tax. We find no merit in Ford's first three arguments, thereby rendering its fourth argument moot. Accordingly, we affirm.

### *Factual Background*

Ford is a Delaware corporation, headquartered in Michigan, that manufacturers and sells motor vehicles and motor vehicle parts. All of Ford's manufacturing activity takes place outside of Delaware.[2] Ford then sells its vehicles and parts to independent dealers for resale to retail customers. There are eleven dealerships located within Delaware which purchase Ford's vehicles along with related products and services.

Ford engages in several practices designed to boost its sales to the independent dealers. For each dealership, Ford develops a sales plan based on Ford's production and the dealer's expected needs. In addition, Ford District and Zone managers with offices in New Jersey and Virginia make frequent visits to dealers in Delaware to persuade these dealers to commit to buying certain models and quantities of Ford vehicles. Ford also enters into with each dealer a Sales and Service Agreement that imposes requirements on the dealers' conduct of business that are designed to enhance the Ford brand and increase sales of vehicles and parts. These requirements include certain sales practices and inventory guidelines, the performance of warranty and other service work on Ford vehicles, the display of Ford signage, and the usage of Ford trademarks. Ford also engages in its own extensive nationwide advertising campaigns, sales, and promotional activities, in addi-

---

1. 2008 WL 2058520 (Del.Super.Ct. Jan. 29, 2008) *rev'd* No. 257, 2008 (Del. Dec. –, 2008).

2. The parties entered into an extensive stipulation concerning the factual circumstances upon which this litigation is premised.

tion to contributing to the local dealers' advertising funds.

Generally, Ford delivers vehicles to the dealers by rail from the assembly plant to a "mixing center" for sorting, then by rail to "destination ramps" for further sorting, then by truck to dealers. A vehicle is assembled at one of eighteen assembly plants, all of which are located outside Delaware. Once assembled, it is moved to a drop zone, which is usually near the assembly plant. From there, an employee of one of the rail or motor carriers inspects and drives the vehicle through what is referred to as the "gate." It is at this point—termed "gate release"—that (the parties have stipulated) title to the vehicles passes from Ford to the dealers to which they are to be delivered. Additionally, gate release is the point at which revenue from the sale is attributed to Ford, the vehicle appears in the dealer's inventory, and the dealer has the right to sell the vehicle. Following gate release, vehicles destined for Delaware dealers travel to a mixing center in Ohio and then to destination ramps located in either Maryland or Pennsylvania.

Ford contracts with various rail and motor carriers to advance the vehicles along this logistical chain, ultimately leading to the purchasing dealer. Ford covers the cost of shipping and controls the arrangements made with the carriers. Ford also reimburses its dealers for any damage *in transitu* and carries insurance to cover the cost of repair. In the infrequent event that the damage exceeds $500, Ford repurchases the vehicle from the dealer and either disposes of it or repairs it to be sold as a used vehicle.

Between January 1999 and October 2002, Ford paid a Delaware Wholesaler's Tax of $3,629,371 on sales of products that were shipped to locations in Delaware. Ford timely applied for a refund of the tax paid, which the Appellate Director of Revenue denied on May 6, 2003. Ford timely filed a protest of the denial with the Director under 30 *Del. C.* § 542, which the Director also denied. Ford then filed an administrative appeal which was removed to the Superior Court pursuant to 30 *Del. C.* § 333 on February 11, 2004. The Superior Court held a bench trial and issued an Opinion and Order affirming the Director's denial of Ford's claim, holding that there was substantial evidence to support the Director's conclusion that Ford was subject to the Wholesalers' Tax and that the Wholesalers' Tax, as applied to Ford, did not violate the Commerce Clause.[3] This appeal followed.

### Standard of Review

We review a trial court's construction of a statute *de novo.*[4] We also review an administrative agency's interpretation of the law *de novo.* Factual findings of an administrative agency are reviewed to determine whether the findings of fact are supported by substantial evidence on the record.[5]

The Wholesalers' Tax requires any entity "engaged in business in this State as a wholesaler ..." to pay a license fee and a tax on the "aggregate gross receipts attributable to sales of tangible personal property physically delivered within this State...."[6] Gross receipts are defined as

3. *Ford Motor Co. v. Dir. of Revenue,* 2008 WL 2058522, at * 12 (Del.Super.Ct. Apr. 25, 2008)

4. *Acadia Brandywine Town Ctr., LLC v. New Castle County,* 879 A.2d 923, 925 (Del.2005); see also *Lehman Bros. Bank, FSB v. State Bank Comm'r,* 937 A.2d 95, 102 (Del.2007).

5. *Lehman Bros. Bank,* 937 A.2d at 102; *State v. Worsham,* 638 A.2d 1104, 1106 (Del.1994).

6. 30 *Del. C.* 2902(b), (c)(1).

"total consideration received from sales of tangible personal property *physically delivered within this State to the purchaser or purchaser's agent....*"[7] Under the statute, the determinative factor is the destination to which the seller delivers (or causes delivery by common carrier of) goods to the purchaser, either inside or outside Delaware, not the contractually agreed upon location of title passage.[8] Ford does not contest that it is a wholesaler or that it receives consideration from the sale of goods ultimately delivered to customers in this State; instead it argues that the Wholesalers' Tax is unconstitutional.

### The Commerce Clause Analysis

■ Ford contends that the Wholesalers' Tax, as applied to the proceeds of its sales where title to the product passes outside Delaware before being physically delivered to dealers in Delaware, violates Article I, § 8 of the United States Constitution (the "Commerce Clause").[9] Specifically, Ford argues the tax violates the "negative" or "dormant" aspect of the Commerce Clause that denies the States the power to exact more than their fair share from interstate commerce than

would be commensurate with the burden imposed by that activity.[10]

In *Complete Auto Transit, Inc. v. Brady,*[11] the United States Supreme Court laid out a pragmatic approach for applying the dormant Commerce Clause to a state's taxation of interstate commerce. A state tax can be sustained against a Commerce Clause challenge where it: "(i) is applied to an activity with a substantial nexus with the taxing State, (ii) is fairly apportioned, (iii) does not discriminate against interstate commerce, and (iv) is fairly related to the services provided by the State."[12] The test is designed to ensure that those engaged in interstate commerce pay their fair share of the state tax burden.[13] On appeal, Ford does not contest the Superior Court's determination that the first and fourth requirements of the test are satisfied. At issue is whether the Wholesalers' Tax is fairly apportioned and whether it discriminates against interstate commerce.

### The Wholesalers' Tax is Fairly Apportioned.

■ A fairly apportioned tax "ensure[s] that each State taxes only its fair share of an interstate transaction."[14] In order for a tax to be fairly apportioned, it

---

7. 30 *Del. C.* § 2901(4)b.

8. 30 *Del. C.* § 2901(7). "[T]he term 'physically delivered within this State' include delivery to the United States mail or to a common or contract carrier for shipment to a place within this State irrespective of F.O.B. or other terms of payment for delivery." *Id.*

9. U.S. CONST., art. I, § 8. It provides, in relevant part: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises ... but all Duties, Imposts and Excises shall be uniform throughout the United States; ... To regulate Commerce with foreign Nations, and among the several States...." *Id.*

10. *Or. Waste Sys. Inc. v. Dep't of Envtl. Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994).

11. 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

12. *Id.* at 279 & 287, 97 S.Ct. 1076.

13. *Id.* at 288–89, 97 S.Ct. 1076 (*overruling Spector Motor Serv. v. O'Connor,* 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951)); *see also Goldberg v. Sweet,* 488 U.S. 252, 260–61, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989)

14. *Okla. Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 184, 115 S.Ct. 1331, 131

must be apportioned in a way that is both internally and externally consistent. "Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear.... External consistency, on the other hand, looks not to the logical consequences of cloning, but to the economic justification for the State's claim upon the value taxed, to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State."[15] Ford has stipulated to the internal consistency of the Wholesalers' Tax.

■■ A challenge on external consistency grounds must do more than show that the "apportionment formula ... *may* result in taxation of some income that did not have its source in the taxing State ...."[16] Rather, the taxpayer must prove "by 'clear and cogent evidence' that the income attributed to the State is in fact 'out of all appropriate proportions to the business transacted in that State', or has 'led to a grossly distorted result.'"[17] In other words, the taxpayer must show that there is no rational relationship between the tax measure attributed to the state and the contribution of local business activity to the entire value.[18] All that is required of the tax is that the apportionment formula dividing the tax base be reasonable.[19]

■ The United States Supreme Court has shied away from the extensive judicial lawmaking required to craft a single acceptable apportionment formula.[20] As a result, states are generally afforded wide latitude in determining how to divide the tax base to ensure that they tax only their fair share of interstate activity.[21] The Supreme Court has approved several methods, including: (1) a federal income tax computation based on a single-factor method using the proportion of the company's gross sales within the state;[22] and (2) a gross receipts tax imposed on the activity of wholesaling based on the proportion of gross wholesale proceeds from sales in the State.[23] The Court has recognized the inherent risk that this might result in some overlap in taxation, but has found this overlap to be not constitutionally significant.[24]

In *Moorman Manufacturing Co. v.*

L.Ed.2d 261 (1995); *Goldberg*, 488 U.S. at 260–61, 109 S.Ct. 582.

**15.** *Jefferson Lines*, 514 U.S. at 185, 115 S.Ct. 1331.

**16.** *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 169–70, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (quoting *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 272, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978)).

**17.** *Id.* at 170, 103 S.Ct. 2933 (quoting *Moorman Mfg.*, 437 U.S. at 274, 98 S.Ct. 2340).

**18.** *Trinova Corp. v. Mich. Dep't of Treasury*, 498 U.S. 358, 380, 111 S.Ct. 818, 112 L.Ed.2d 884 (1991).

**19.** *Lehman Bros. Bank*, 937 A.2d at 112.

**20.** *Goldberg*, 488 U.S. at 261, 109 S.Ct. 582; *Moorman Mfg.*, 437 U.S. at 278, 98 S.Ct. 2340

**21.** *Moorman Mfg.*, 437 U.S. at 274, 98 S.Ct. 2340; *accord Jefferson Lines*, 514 U.S. at 195, 115 S.Ct. 1331; *Goldberg*, 488 U.S. at 261, 109 S.Ct. 582; *Container Corp.*, 463 U.S. at 171, 103 S.Ct. 2933; *Lehman Bros. Bank*, 937 A.2d at 112.

**22.** *Moorman Mfg.*, 437 U.S. at 270–71, 98 S.Ct. 2340.

**23.** *Tyler Pipe Indus. v. Wash. State Dep't of Revenue*, 483 U.S. 232, 251, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987)

**24.** *Moorman Mfg.*, 437 U.S. at 278, 98 S.Ct. 2340.

*Bair*,[25] the state of Iowa apportioned income for its state income tax by a ratio of Iowa destination sales to the taxpayer's total sales. In contrast, Illinois used a three-factor formula based on the ratios of property, payroll, and sales. The taxpayer argued that the Commerce Clause required the use of the three-factor formula to avoid multiple taxation. The Court held that the Iowa single factor method did not violate the Commerce Clause because the Commerce Clause did not forbid all overlap in taxation.[26] The Court further explained that, had Iowa imposed a gross receipts tax on Iowa destination sales—precisely the tax at issue here—the tax would be "plainly valid," even though such a tax would have been more burdensome than the net income tax at issue.[27]

In *Tyler Pipe Industries v. Washington State Department of Revenue*,[28] the United States Supreme Court found a gross receipts tax analytically similar to Delaware's Wholesalers' Tax was fairly apportioned and passed constitutional muster. The appellant sought a refund of wholesale taxes it paid on goods that were manufactured outside of Washington but were shipped and sold to customers within the state. It argued that the tax did not fairly apportion the tax burden between the appellant's activities in Washington and its activities in other states. In upholding the tax, the Court explained:

> Washington taxes the full value of receipts from in-state wholesaling or manufacturing; thus, an out-of-state manufacturer selling in Washington is subject to an unapportioned wholesale tax even though the value of the wholesale transaction is partly attributable to manufacturing activity carried on in another State that plainly has jurisdiction to tax that activity. This apportionment argument rests on the erroneous assumption that through the ... tax, Washington is taxing the unitary activity of manufacturing and wholesaling. We have already determined, however, that the manufacturing tax and wholesaling tax are not compensating taxes for substantially equivalent events in invalidating the multiple activities exemption. Thus, the activity of wholesaling—whether by an in-state or an out-of-state manufacturer—must be viewed as a separate activity conducted wholly within Washington that no other State has jurisdiction to tax.[29]

In Delaware, the Superior Court has held that the Wholesalers' Tax is fairly apportioned and passes constitutional mus-

---

**25.** 437 U.S. at 270, 98 S.Ct. 2340.

**26.** *Id.*

**27.** *Id.* at 280–81, 98 S.Ct. 2340 (citing *Std. Pressed Steel Co. v. Wash. Revenue Dep't*, 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975)).

**28.** 483 U.S. at 251, 107 S.Ct. 2810. The Washington tax at issue defined sales producing taxable gross receipts as "any transfer of the ownership of, title to, or possession of property for a valuable consideration." WASH. REV. CODE § 82.04.040(1). Since at least 1947, Washington has interpreted this statute as establishing a destination test. *See Wash. Admin. Code* § 458–20–103 (1982) ("For the purpose of determining tax liability of persons selling tangible personal property, a sale takes place in this state when the goods sold are delivered to the buyer in this state, irrespective of whether title to the goods passes to the buyer at a point within or without this state."); TAX COMM'N OF THE STATE OF WASH., RULES RELATING TO THE REVENUE ACT R. 103 (1947).

**29.** *Tyler Pipe*, 483 U.S. at 251, 107 S.Ct. 2810 (citing *Moorman Mfg.*, 437 U.S. at 280–81, 98 S.Ct. 2340; *Std. Pressed Steel*, 419 U.S. at 564, 95 S.Ct. 706 (holding wholesale gross receipts tax measured by gross proceeds of sales is "perfectly apportioned to the activities taxed")).

ter. In *Saudi Refining, Inc. v. Director of Revenue*,[30] the taxpayer shipped crude oil from outside Delaware via tankers to a refinery located in Delaware City. Title, custody, and risk of loss passed to the refinery at the first flange of the outer intake valve of the refinery. Although the title passed in Delaware, the Superior Court's decision regarding apportionment was based solely on the delivery requirement:

> Delaware seeks to tax only sales that are consummated by physical delivery within the state. This comports with the requirement that a state tax "only that portion of the revenues from interstate activity which reasonably reflect the in-state component of the activity being taxed."[31]

Relying on *Saudi Refining*, Ford contends that it does not physically deliver *any* vehicles to Delaware because title passes at gate release. However, this ignores the fact that Ford's customers contracted not just to purchase goods, but to have them delivered to a destination in Delaware as well. Although title and risk of loss pass to Ford's customers at gate release, Ford retains continuous and considerable control over the delivery process, stands in a contractual relationship with the carrier, is the named beneficiary on the cargo insurance, and takes responsibility for issues arising during delivery. Moreover, Ford dedicates a portion of its national advertising efforts to increasing its market share in Delaware.

*Tyler Pipe* is squarely on point. In that case, Washington required out-of-state manufacturers to pay a gross receipts tax on the sale of all goods delivered to buyers within the state, regardless of whether title to those goods passed to the buyer at some point outside the state. Delaware's Wholesalers' Tax, like the tax at issue in *Tyler Pipe*, poses no risk of impermissible multiple taxation—it applies only to gross receipts from "sales of tangible personal property *physically delivered within this State* to the purchaser or the purchaser's agent. . . ."[32] Ford contends that this definition permits states in which the vehicle are delivered to the mixing areas and destination ramps to impose the same tax, but this argument overlooks that the dealer is the purchaser and that *physical delivery* to the dealer occurs only in Delaware. Only Delaware has the jurisdiction to tax this separate activity conducted wholly within this State.[33] Therefore, as in *Tyler Pipe*, the Wholesalers' Tax is not "out of all appropriate proportion to the business transacted" in this state, nor is the result "grossly disproportionate."

### The Wholesalers' Tax Does Not Discriminate Against Interstate Commerce

Ford contends that the Wholesalers' Tax discriminates against interstate commerce. A state may not discriminate against a taxpayer that conducts business in interstate commerce, by "providing a direct commercial advantage to local busi-

---

**30.** 715 A.2d 89, 91–93 (Del.Super.Ct.1998)

**31.** *Id.* at 97 (citing *Goldberg*, 488 U.S. at 262, 109 S.Ct. 582).

**32.** 30 *Del. C.* § 2902(c)(1) (emphasis added).

**33.** Even if these other states imposed a tax on a different stage of the sale, there would be no impermissible taxation. *See Moorman Mfg.,*

437 U.S. at 278 n. 13, 98 S.Ct. 2340 (finding differing definitions of "sale" could lead to permissible level of multiple taxation); *see also Jefferson Lines*, 514 U.S. at 187–88, 115 S.Ct. 1331 (finding Commerce Clause does not forbid the assessment of a succession of taxes by different States on distinct events as the same tangible object flows along).

ness."[34] A tax that unfairly apportions activity from other states discriminates against interstate commerce.[35]

Ford argues that even assuming it conducted *all* of its wholesaling in Delaware and had the same gross receipts from sales to Delaware dealers, its wholesaler tax liability would remain unchanged. Ford claims this is discriminatory inasmuch as it is being penalized for conducting most of its wholesaling activities outside of the State. Ford also argues the tax is discriminatory because a Delaware wholesaler that sells vehicles only to out of state customers is subject to no tax at all.

Ford's argument lacks merit. As the Superior Court explained, the Wholesalers' Tax "treats any wholesaler engaged in wholesaling in Delaware the same. All must pay a tax on the gross receipts of the wholesaling activity without regard to where or how the goods were manufactured or assembled."[36] This is not discriminatory to interstate commerce, as it gives Delaware wholesalers no advantage over out-of-state wholesalers—both pay a tax on the gross receipts on goods physically delivered to customers in Delaware.

### Dial Corp. v. Director of Revenue Does Not Affect the Outcome of This Appeal

Ford contends that the Superior Court's decision in *Dial Corp. v. Director of Revenue,*[37] compels a holding that Delaware cannot constitutionally tax Ford's receipts

from Delaware dealerships. *Dial* does not compel such a holding, for two reasons. First, our review of questions of law is *de novo.* Second, we have reversed today the Superior Court's decision in *Dial.*[38]

### The Wholesalers' Tax Was Not Applied to Products "Physically Delivered" Outside Delaware

Ford claims that the Superior Court erred in holding that the Wholesalers' Tax permits taxation of receipts from sales of its vehicles "physically delivered" outside Delaware. Ford claims that none of its vehicles were physically delivered to Delaware as all were sent by common carrier to the mixing center in Ohio. This claim elevates form over substance. While Ford did not technically own the vehicles following gate release, it controlled their ultimate delivery in Delaware, reimbursed dealers for damage, and carried insurance for the cost of repair of any damage after gate release. While the gate release is factor to be considered, as a practical matter, Ford caused deliveries to dealers in Delaware.[39] As applied to Ford, the Wholesalers' Tax did not violate the Commerce Clause of the United States Constitution.

### Conclusion

The judgment of the Superior Court is **AFFIRMED.**

---

34. *Nw. States Portland Cement Co. v. State of Minn.,* 358 U.S. 450, 458, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959).

35. *Armco Inc. v. Hardesty,* 467 U.S. 638, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984).

36. *Ford Motor Co.,* 2008 WL 2058522, at *32.

37. 2008 WL 2058520 (Del.Super.Ct. Jan. 29, 2008), *rev'd* No. 257, 2008 (Del. Dec. –, 2008).

38. *Dir. of Revenue v. Dial Corp.,* No. 109, 2008, 2008 WL 5146861 (Del.Dec. 8, 2008) (Order).

39. Ford contends that it is entitled to pre-judgment interest on any refund of the Wholesalers' Tax. Because we find that Ford is not entitled to refund of the Wholesalers' Tax, we need not reach this issue.